[No. S038499. Feb. 15, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN M. BELL, Defendant and Appellant.

## COUNSEL

Anthony J. Dain, under appointment by the Supreme Court; and Gisela Caldwell for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Lynn G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Defendant Steven M. Bell was convicted of first degree murder with a robbery-murder special circumstance (Pen. Code, §§ 187, 189, 190.2, subd. (a)(17)) and sentenced to death for the 1992 killing of Joey Anderson. On automatic appeal, we affirm the judgment in its entirety.

### FACTUAL AND PROCEDURAL BACKGROUND

*Guilt Phase Trial*

*Prosecution Evidence*

On June 4, 1992, defendant was living at the San Diego home of his girlfriend, Deborah Mitchell, with Mitchell and her 11-year-old son, Joey

Anderson. On that morning, after Mitchell left for work and Joey went to school, defendant walked to a local government office and obtained a $111 assistance check. According to defendant's statement to police, he cashed the check and, in the early afternoon, used the cash to buy crack cocaine, which he smoked with several acquaintances. Around 3:00 p.m., defendant ran out of money and returned to Mitchell's house with the plan of taking items to sell in order to buy more crack.

According to defendant's statement, he expected Joey still to be at school. In fact, however, Joey had come home from school earlier than usual and was watching television in his mother's bedroom. After getting a shopping cart from behind the building, defendant entered the bedroom intending to take the television. Seeing Joey, defendant went to the kitchen, took a knife from a drawer, and returned to the bedroom. There he stabbed Joey in the back and, when Joey fell to the floor, stabbed him several more times and stomped on Joey's head with his foot.

After killing Joey, defendant took the television and a "boom box" from Joey's room and put both in the shopping cart. Defendant wrapped the bloody knife in a plastic bag and covered the shopping cart's contents with a blanket. He then left with the cart, waving to a neighbor as he passed. He dropped the knife on a trash pile, sold the television and boom box, and used the proceeds to buy more crack cocaine, which he smoked with a woman companion.

Mitchell discovered her son's body when she returned from work. Joey was lying on the bedroom floor near the television stand, his partly eaten lunch nearby. According to the medical examiner, Joey had multiple stab wounds in the abdomen, chest and back (including a seven-inch-deep stab wound to the chest that caused fatal damage), a skull fracture, and bleeding or bruising of the brain.

About 10:45 the next morning, defendant approached a police officer who was directing traffic. Showing the officer a newspaper article about Joey's killing, defendant identified himself and said he did not stab the boy. In his initial interview with homicide detectives at the station, defendant admitted taking the television and boom box in order to buy drugs, but denied Joey was at home when he did so.

In a second interview, defendant admitted killing Joey. He said he did not know why he had killed Joey instead of just taking the television; he had gotten along well with Joey and was not angry at the boy. Defendant said he "just flipped." As he got the knife from the kitchen, he felt "so evil," as if "something's pushing me to do this," and he "ask[ed] the Lord's help."

*Defense Evidence*

The defense did not dispute that defendant had taken the television and boom box and had killed Joey, but sought, through expert testimony regarding defendant's mental health and drug use, to cast doubt on the existence of a connection between the thefts and the killing.

A toxicologist testified that a sample of defendant's urine, taken at the time of his arrest the day after the crimes, showed the presence of benzoylecgonine, a cocaine metabolite, in a concentration greater than 6,000 nanograms per milliliter, the upper calibration limit of the machine used for this test. A sample of defendant's blood contained 92 nanograms per milliliter of benzoylecgonine, but no cocaine itself.

A pharmacologist testified the measured blood level of benzoylecgonine would be considered a "moderate quantity" if the sample was taken immediately after smoking cocaine or would indicate a "much larger" cocaine dose if the crack cocaine had been smoked many hours earlier, as was suggested by the fact that no actual cocaine was found in the blood sample. The measured urine concentration indicated a level of cocaine consumption that may have been either "relatively high" or "enormous," depending on how much greater than 6,000 nanograms per milliliter the urine concentration was. In answer to a hypothetical question based on the facts outlined in defendant's statements to the police, the pharmacologist opined that the observed blood concentration of benzoylecgonine was consistent with the hypothesized timing and amount of defendant's cocaine consumption.

Dr. David Smith, a specialist in addiction medicine and clinical toxicology, testified to the effects of crack cocaine on the body and mind. These can include violent "rage reaction[s]," "cocaine psychosis" (a paranoid schizophrenic-like reaction found with long-term repeated use), and the manifestation of a preexisting personality disorder. Based on his personal evaluation of defendant, his review of police, toxicological and psychological reports, and defendant's recorded confession, Smith opined defendant's killing of Joey was neither a rage reaction nor a classic cocaine psychosis. Instead, he believed, defendant's crack cocaine use precipitated a psychotic "decompensation" episode in which defendant experienced "dissociation" from his own actions. Defendant was prone to such a reaction because of his borderline personality disorder (a diagnosis Smith drew from his own observations and from psychological reports provided to him). According to Smith,

a person with borderline personality disorder—a disorder associated with "very dysfunctional child rearing"—has "a relatively thin level of functioning, but underneath it, for example, has a psychotic personality." Such a person has reduced impulse control and an increased incidence of dissociative reactions. Under the influence of drugs, the person can have "a break with reality in which the individual depersonalizes, . . . seeing themselves doing something as if it's somebody else."

Smith found defendant's explanation of Joey's killing consistent with a past episode, occurring in 1981 when defendant was 15, in which defendant had stabbed and sodomized a 13-year-old schoolmate. In both cases, defendant (whose borderline personality disorder would already have existed at the earlier age) was using drugs (PCP in the 1981 episode). In both cases, defendant attacked a nonthreatening boy with a knife. In both cases, according to Dr. Smith, defendant experienced depersonalization and a sense that someone or something was telling him to commit the violent acts.

Richard Levak, a clinical psychologist, interviewed defendant, administered the Minnesota Multiphasic Personality Inventory to him, and reviewed materials from the current and 1981 incidents. Like Smith, Levak diagnosed defendant as having borderline personality disorder. A person with this severe disturbance in identity can function well in a structured situation, but when confronted with even minor stressors can experience brief, transitory loss of contact with reality. The disorder originated in defendant's childhood situation: his mother provided for him but did not like him or show him affection; defendant stuttered, which reminded his mother of defendant's father, who had left her; defendant's stuttering made his mother impatient and angry; defendant's stepfather drank and physically abused him, alternating the abuse with episodes of tenderness; defendant suffered ridicule at school because of his stutter and the "preppy" way his mother dressed him. This combination of circumstances caused "a completely damaged self-identity, . . . an escape into fantasy, . . . an attempt to shut down all emotions . . . and this confusion of sexuality and aggression." In response, defendant began drinking alcohol by age nine and using other drugs by early adolescence.

According to Levak, defendant identified with Joey, who was having trouble at school and, as a consequence, was sometimes whipped by his mother. On the day of the crimes, defendant, severely stressed by his cocaine use, unexpectedly encountered Joey at home. "And then I think that having a lot of mixed feelings, that he has a temporary psychotic break, a lot of old feelings of anger and rage from his own childhood are suddenly erupted, and

he then feels this compulsion to kill Joey, and in the process, I believe, he's killing a part of himself." The 1981 incident, Levak opined, was "eerily similar"—there too defendant, under the influence of drugs and having "experienced a life in which violence and affection were linked," found his feelings of affection for the victim "too much for him to deal with" and assaulted the victim in a brief psychotic episode.

### Prosecution Rebuttal Evidence

A toxicologist called by the prosecutor disputed the defense pharmacologist's analysis of the results of defendant's drug tests. He disagreed with the defense expert's statement that a urinary benzoylecgonine concentration greater than 6,000 nanograms per milliliter suggested the subject had smoked more than a single hit of crack cocaine. He stated the defense expert had used an incorrect value for the half-life of benzoylecgonine in answering the hypothetical question regarding blood levels of that chemical. Using the correct half-life value, he opined the hypothetical person's blood-benzoylecgonine concentration would have been around 890 nanograms per milliliter, rather than the 90 nanograms per milliliter measured in defendant's blood the day after the crime. Calculating backward from the measured blood concentration, the prosecution toxicologist found that concentration could have resulted from smoking about 100 milligrams of crack cocaine (about one hit) at 1:00 p.m. the day before the blood sample was taken.

A psychiatrist and a psychologist called by the prosecutor both disagreed with the opinions of the defense experts that defendant had killed Joey during a brief psychotic break with reality caused by borderline personality disorder and triggered by crack cocaine use. According to the prosecution psychiatrist, a cocaine-induced break with reality can occur, but only in "extreme situations . . . in terms of dose and duration of exposure," as when a person uses cocaine for days on end without eating or sleeping. The psychologist noted that borderline personality disorder commonly involves suicidal or self-mutilatory acts or gestures, which were not present in defendant's history, and opined that to the extent defendant had a personality disorder it was "a mixed personality disorder with predominantly anti-social features." As to a break in contact with reality during the killing, the psychologist observed that before and after the killing defendant had acted in a rational manner; he opined that psychotic decompensation "doesn't just happen with the flick of a switch." He would also expect a cocaine-triggered psychotic episode to occur when the intoxication from the cocaine was at its greatest, rather than "several hours later" when defendant killed Joey.

The prosecution psychologist also observed that defendant, when he initially confessed to the 1981 attack on his schoolmate, did not mention having heard voices directing him to attack the victim, though he later told a psychologist he had. The videotape of defendant's initial 1981 interview with a Manhattan prosecutor was played for the jury. In that interview, defendant said that he was drinking whisky with three friends, including the victim. When one of them got sick, they took him to the hospital. In the late evening, defendant was alone with the victim in the victim's bedroom. Defendant went to the kitchen for a drink of water, but also took a large kitchen knife from a drawer and brought it back to the bedroom. When the victim went to turn off the stereo, defendant stabbed him in the back. The victim fell onto his bed and asked defendant to take him to the hospital. Instead, defendant got some Vaseline from the bathroom and, after pulling down the victim's pants and underpants, put Vaseline on his anus and sodomized him. Defendant then departed, leaving the victim undressed with the knife still in him.

*Penalty Phase Trial*

*Prosecution Evidence*

In aggravation, the prosecution presented evidence of the 1981 offense's impact on its victim and of the impact of Joey's killing on his family.

The 1981 victim testified that after an evening of drinking alcohol and smoking marijuana, he was alone with defendant in the victim's bedroom. Defendant said he had dropped his keys behind the bed and asked the victim to get them. When the victim leaned over, defendant stabbed him in the back with a butcher knife. The knife penetrated through the victim's body, emerging at his chest. He blacked out; when he came to, he was on the floor, paralyzed. By the time of trial he had recovered some use of his legs, though he still used a wheelchair as well. As a result of the attack, he lost a lot of schooltime and never graduated. He had no job and depended on government payments.

Deborah Mitchell, Joey's mother, briefly described her life with Joey before his death. After his killing, she could not return to their home and moved away from San Diego, where most of her family lived, to the San Francisco Bay Area, where her daughter lived. At the time of trial, she was in therapy and a support group but still felt great pain from the loss of Joey. Mitchell's father described his grandson, with whom he was close, as a talkative and playful boy. After Joey's death, Mitchell was very disturbed and became more distant from her family, apparently feeling the family held her responsible for Joey's killing.

*Defense Evidence*

Several members of defendant's family—two aunts, a cousin, and his sister Lisa—described his childhood and immediate family, and in particular his parents' emotional neglect and physical abuse. Defendant's mother was reserved and unaffectionate. She did not hug or show affection to defendant, and as a small child defendant was unaccustomed to being held or kissed. When defendant was two years old, he was hospitalized for close to two weeks for pneumonia; his mother visited him only once in that time. Defendant began stuttering when he was a little older; his mother was annoyed and told him to "say what you have to say or shut up." His mother's impatience caused defendant to withdraw as if he were ashamed. Eventually defendant's communication with his mother decreased; Lisa, who was a few years older, would speak for him because he was too nervous.

Defendant's father was an intravenous drug user who stole from the family home. Defendant's father and mother divorced when defendant was two or three years old and after that, contact with his father was rare. Defendant's mother remarried when defendant was six or seven years old. To discipline defendant, his stepfather beat him once or twice a week, using his hands, a belt or an electric cord. He also sexually molested Lisa repeatedly from when she was 11 years old until she joined the Army and left home at 17.

A number of witnesses testified to defendant's good behavior while he was confined at the Harlem Valley Youth Detention Center for the 1981 offense. Defendant was somewhat passive, but friendly, intelligent and trustworthy; he worked for years in the facility kitchen together with the women employees, who came to regard him as a friend or little brother; he was not involved in violent incidents and earned his general equivalency diploma and some college credits. Unlike other residents' families, defendant's family did not visit him at Harlem Valley.

The director of Theatre Rehabilitation for Youth (TRY) testified to defendant's participation in TRY programs both during and after his confinement at Harlem Valley. During his confinement, defendant participated in TRY workshops and shows at Harlem Valley, acted in a touring show, and wrote poetry and portions of scripts for the shows. He became more confident and did not stutter on stage. In one scene defendant wrote about himself, he asked: "But what if I can't forgive myself?" The director felt that defendant became like a son to him. He hired defendant after his release from custody to operate sound and lighting equipment for TRY's touring show. Although sometimes appearing strung out from drug use, defendant worked hard and responsibly for some months, but was dismissed when he falsely reported his paycheck missing. After his dismissal, defendant voluntarily worked a week without pay to repay what he had taken.

A sociologist described Lexington Houses, the Manhattan public housing project where defendant grew up, and the surrounding neighborhood of East Spanish Harlem. The area had been a drug-selling zone for at least 30 years; in the 1980's, it was flooded with crack cocaine. .

The admissions director of a private junior college in San Diego testified that defendant enrolled to study accounting in 1990. In his first quarter of classes he got straight A's, but in the second quarter he seemed troubled and eventually quit attending. He returned in May 1992 and reenrolled, planning to start classes in August.

A correctional consultant testified to the maximum security conditions under which life prisoners are held in California prisons. He also opined, based on defendant's history in confinement, that defendant would be an excellent prisoner if sentenced to life without the possibility of parole.

A psychologist who analyzed defendant's responses to the Minnesota Multiphasic Personality Inventory and reviewed materials from the 1981 and charged offenses opined (in accord with the guilt phase defense experts) that defendant had borderline personality disorder and that Joey's killing had "all the hallmarks" of a transient psychotic episode.

### Prosecution Rebuttal Evidence

A probation officer testified that in 1991 she had discussed the 1981 incident with defendant. He said that while he and a friend were smoking PCP, "his friend grabbed a butcher knife, but he stabbed his friend first." Defendant also said he and the victim were still friends and did not mention that he had sodomized the victim after stabbing him. A deputy sheriff at the San Diego County jail testified defendant was kept in segregation from the main population while awaiting trial.

### Procedural History

In an information filed August 12, 1992, defendant was charged with murder (count 1: Pen. Code, § 187, subd. (a)),[1] with an allegation of personal use of a deadly weapon (§ 12022, subd. (b)) and special circumstance allegations of murder in the commission of robbery and burglary (§ 190.2, subd. (a)(17)); residential robbery (count 2: §§ 211, 212.5) with personal use and great bodily injury allegations (§§ 12022, subd. (b), 12022.7); and residential burglary (count 3: §§ 459, 460) with personal use and great bodily injury allegations (§§ 12022, subd. (b), 12022.7). The burglary charge, its

---

[1] All further unspecified statutory references are to the Penal Code.

accompanying allegations, and the burglary-murder special-circumstance allegation were dismissed before trial on defendant's motion under section 995.

On November 22, 1993, the jury found defendant guilty of first degree murder and robbery, and found true the robbery-murder special-circumstance allegation and the allegations of personal use of a deadly weapon and infliction of great bodily injury. On December 17, 1993, the jury returned a verdict of death. On March 7, 1994, having denied the automatic motion to reduce the penalty and defendant's motion for a new trial, the trial court sentenced defendant to death on count 1 and to a 10-year determinate sentence on count 2, the latter sentence being stayed under section 654.

The appeal to this court is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

## DISCUSSION

### I. Wheeler-Batson *Motions: Existence of Prima Facie Case*

Defense counsel made three motions under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*), and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), claiming the prosecutor had used peremptory challenges to deliberately exclude African-American women, people of Filipino origin or descent, and lesbians. The trial court found no prima facie case of discrimination as to any of these groups, a set of findings defendant contends was error. We conclude the trial court was correct.

#### *Factual Background*

When the prosecutor excused Prospective Juror Gwendolyn J., defense counsel made a *Wheeler-Batson* motion on the basis of her race, arguing that none of her questionnaire answers showed "favor either way." The trial court observed that the prosecutor had challenged only one of the three African-Americans currently on the jury panel, with four more remaining in the group still subject to peremptory challenge, and found no prima facie case of exclusion on the basis of race.

Later, when the prosecutor peremptorily challenged another African-American woman, Lisa J.-S., as an alternate juror, defense counsel claimed the prosecutor was "using group bias to exclude African-American women,"

a cognizable group for *Wheeler* purposes under *People v. Motton* (1985) 39 Cal.3d 596, 605–606 [217 Cal.Rptr. 416, 704 P.2d 176]. The court noted that a third African-American woman, Helen L., remained on the panel and ascertained that the prosecutor did not intend to challenge her. The court also noted that the jury panel included three African-American men; that defendant was not a member of the group to which defense counsel claimed group bias was being applied; and indeed that the group, African-American women, "is actually more closely related to the victim than to the defendant," viewing Joey's mother as a victim of defendant's alleged crimes. In those circumstances, the court found, the prosecutor's excusal of two out of three African-American women did not create a prima facie case of intentional discrimination.

Defense counsel also contended the prosecutor's peremptory challenges to Prospective Jurors Charles B. and Saldy P. were motivated by "group bias against Filipino Americans." The trial court agreed both men were Filipino-Americans and assumed, for purposes of the motion, that Filipino-Americans are a cognizable group under *Wheeler* and *Batson.* The court observed, however, that membership in that group was not always easy to determine, as the questionnaire used did not ask potential jurors to identify their ethnic group; at least two other members of the jury panel, in the court's view, could have been Filipino-Americans. The court also noted that neither defendant nor any victim in the case was Filipino- or Asian-American. In those circumstances, the court found, the prosecutor's excusal of two Filipino-Americans did not create a prima facie case of group bias.

Finally, defense counsel claimed the prosecutor had exercised group bias against lesbians in peremptorily challenging Prospective Jurors Francene B. and Lynne W. Asked for the factual basis to believe Francene B. was a lesbian, counsel pointed to "her physical appearance" and the fact she had participated in a gay rights march, "is involved with other feminist issues and reads women's literature." In the case of Lynne W., counsel pointed to her "non-traditional job" (as a carpenter and locksmith) and that she "reads women's issues." The trial court, finding no basis for concluding either woman was a lesbian, denied the *Wheeler* motion.

In a motion for new trial, the defense renewed its *Wheeler-Batson* motions with regard to African-American women and Filipino-Americans. The trial court repeated its conclusion that no prima facie case had been made as to either group, stating that the record did not show a "strong likelihood" of discrimination.

## Analysis

■ "A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler, supra,* 22 Cal.3d at pp. 276–277; see *People v. Griffin* (2004) 33 Cal.4th 536, 553 [15 Cal.Rptr.3d 743, 93 P.3d 344].) Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. (*Batson, supra,* 476 U.S. at p. 88; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].)" (*People v. Avila* (2006) 38 Cal.4th 491, 541 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

"The United States Supreme Court has recently reaffirmed that *Batson* states the procedure and standard to be used by trial courts when motions challenging peremptory strikes are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' (*Johnson v. California* (2005) 545 U.S. 162, [168] [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.)" (*People v. Avila, supra,* 38 Cal.4th at p. 541.) We have endorsed the same three-part structure of proof for state constitutional claims. (*People v. Snow* (1987) 44 Cal.3d 216, 222 [242 Cal.Rptr. 477, 746 P.2d 452]; *Wheeler, supra,* 22 Cal.3d at pp. 280–282.)

The trial court's statement, in denying defendant's new trial motion, that it failed to find a "strong likelihood" of discrimination suggests the court may have used a standard for the prima face case that was later found too demanding under *Batson*. "[O]ur *Wheeler* decision . . . alluded to a 'reasonable inference' of group bias as a basis for a prima facie showing and also called for the defendant to establish a 'strong likelihood' that a juror has been peremptorily challenged on the basis of group bias. (*Wheeler, supra,* 22 Cal.3d at pp. 280, 281.) Our subsequent decision holding that both of the quoted terms were essentially the same as the *Batson* standard, and that a prima facie showing called for a demonstration that it was 'more likely than not' that group bias accounted for the challenge, was disapproved in *Johnson* [*v. California, supra,* 545 U.S. at pp. 169–172] (reversing *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270])." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

Even assuming the trial court applied the wrong standard, however, reversal is not necessarily required. Where it is unclear whether the trial court applied the correct standard, we review the record independently to "apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis. (*People v. Cornwell, supra*, 37 Cal.4th at p. 73; accord, *People v. Avila, supra*, 38 Cal.4th at p. 554.)

 Though proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned "certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*Wheeler, supra*, 22 Cal.3d at pp. 280–281, fn. omitted; see also *Batson, supra*, 476 U.S. at pp. 96–97 [in assessing a prima facie case, the trial court should consider "all relevant circumstances," including "a 'pattern' of strikes against black jurors" and "the prosecutor's questions and statements during *voir dire* examination"]; *U.S. v. Grandison* (D.Md. 1988) 721 F.Supp. 743, 747 [that the prosecutor did not engage in "desultory or half-hearted questioning" of excused jurors is a factor against prima facie showing]; *United States ex rel. Henderson v. Page* (N.D.Ill. 2000) 2000 WL 1466204, p. *13 ["heterogeneity of the stricken black venire members" is relevant *Batson* circumstance]; *United States ex rel. Kyles v. O'Leary* (N.D.Ill. 1986) 642 F.Supp. 222, 228 [defendant's membership in group allegedly excluded, together with victim's membership in majority group, is relevant *Batson* circumstance].)

 We agree with the trial court that the defense did not make a prima facie case that Gwendolyn J. and Lisa J.-S. were challenged because they are African-American women. As noted, African-American women constitute a cognizable group under *Wheeler*. (See *People v. Motton, supra*, 39 Cal.3d at pp. 605–606.) While the prosecutor did excuse two out of three members of

this group,[2] the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible. "[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion." (*People v. Harvey* (1984) 163 Cal.App.3d 90, 111 [208 Cal.Rptr. 910].)[3] Nor did the prosecutor use "a disproportionate number of his peremptories against the group" (*Wheeler, supra,* 22 Cal.3d at p. 280); only two of the prosecutor's 16 peremptory challenges were exercised against African-American women.[4] Defendant does not contend Gwendolyn J. and Lisa J.-S. shared only the characteristic of being African-American women and were otherwise "as heterogeneous as the community as a whole." (*Wheeler,* at p. 280.) Nor does he assert the prosecutor engaged these prospective jurors in particularly "desultory" questioning on voir dire. (*Id.* at p. 281.)[5] Lastly, defendant is not

---

[2] Defendant argues the third African-American woman, Helen L., who served as an alternate, should not be considered in our analysis because had the prosecutor challenged her he would have had to accept a different alternate "with strong anti-death penalty feelings." The only record evidence cited for this proposition, however, is defense counsel's own assertion of it during a new trial hearing. Nor do we agree with defendant that the trial court effectively told the prosecutor "he would have to accept" Helen L. The trial court observed that if the prosecutor did not challenge Helen L. "that would make a difference" in its prima facie case analysis because "two out of three is different than two out of two," but the court never indicated it would grant the *Wheeler-Batson* motion, or even find a prima facie case, if the prosecutor challenged Helen L.

[3] To be sure, the ultimate issue to be addressed on a *Wheeler-Batson* motion "is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." (*People v. Avila, supra,* 38 Cal.4th at p. 549.) But in drawing an inference of discrimination from the fact one party has excused "most or all" members of a cognizable group (*Wheeler, supra,* 22 Cal.3d at p. 280), a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges. Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case, including this one, to make a prima facie case after the excusal of only one or two members of a group is very difficult. (Accord, *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190, 1198.)

[4] A more complete analysis of disproportionality compares the proportion of a party's peremptory challenges used against a group to the group's proportion in the pool of jurors subject to peremptory challenge. Here the prosecutor used two of his 16 peremptory challenges, or 12.5 percent, against African-American women, while of the 47 prospective jurors who were subject to peremptory challenge, three, or about 6.4 percent, were African-American women. Though the former figure is almost twice the latter, because of the small sample size the disparity carries relatively little information. (See *Wade v. Terhune, supra,* 202 F.3d at p. 1198 [significance "limited" where corresponding ratios were "four of sixty-four (or 6%)" (proportion of group in pool) and "one of three (or 33%)" (proportion of challenges exercised against group)].)

[5] Renewing the *Wheeler-Batson* arguments in the motion for new trial, defense counsel asserted the prosecutor's questioning of the excused African-American women was perfunctory. The trial court observed in response that the prosecutor *had* asked the women questions, "but, more importantly, we had an extensive questionnaire with regard to every juror. So even if perfunctory questioning was done as to any juror, when you have a questionnaire, it can

a member of the group allegedly excluded, African-American women. Indeed, as the trial court observed, one of the victims of defendant's crimes, Joey's mother, was an African-American woman.[6] Moreover, the prosecutor did not exercise peremptory challenges against most or all members of *defendant's* parallel group, African-American men; three of them served on the jury. These facts, we believe, simply do not " 'give[] rise to an inference of discriminatory purpose.' " (*Johnson v. California, supra,* 545 U.S. at p. 168.)

For much the same reasons, we disagree the defense made a prima facie case that Charles B. and Saldy P. were excused because they are of Filipino origin or ancestry. Assuming, as did the trial court, that both men are Filipino-Americans and that Filipino-Americans are, for purposes of *Wheeler* and *Batson,* a cognizable group distinct from other Asian-Americans, the record nonetheless fails to show how many other Filipino-Americans were in the venire and were not challenged by the prosecutor. The prosecutor did not use an extraordinary number of his peremptory challenges against members of this ethnic group, nor does defendant claim the prosecutor's voir dire of these prospective jurors was unusually desultory or that in respects other than their ethnic background or national origin the two were especially heterogeneous. Neither defendant nor any of the victims or percipient witnesses to the crimes were Filipino-Americans. Under these circumstances, the prosecutor's excusal of two Filipino-Americans does not create an inference of discrimination.

The defense showing was even weaker with regard to Prospective Jurors Francene B. and Lynne W., as nothing in the record showed they were members of the group against whom defense counsel claimed the prosecutor was discriminating, lesbians. (Like the trial court, we assume lesbians are a cognizable group for *Wheeler-Batson* purposes.) In the context of racial discrimination, we have stated that a *Wheeler* motion may sometimes be based on "appearances," without the need to "establish the true racial identity of the challenged jurors" (*People v. Motton, supra,* 39 Cal.3d at p. 604), but sexual orientation is usually not so easily discerned from appearance. Without any definite indication that the challenged prospective jurors either were lesbians or that the prosecutor believed them to be such, no prima facie case of discrimination against lesbians as a group can be made. (See *In re Freeman* (2006) 38 Cal.4th 630, 644–645 [42 Cal.Rptr.3d 850, 133 P.3d 1013]

never be a perfunctory examination." Defendant does not contend the questioning was especially desultory in light of the questionnaires.

[6] Defendant notes that Mitchell, Joey's mother, was not "in a legal sense" a victim of the charged homicide and robbery. That is irrelevant for the present purpose, however, as the loss of her son at defendant's hands obviously made her a victim of defendant's crimes as the jury would see it.

[*Wheeler-Batson* claim failed for insufficient showing that challenged prospective jurors either were Jewish or were thought to be so by the prosecutor].) Even assuming Francene B. and Lynne W. are lesbians or were thought to be such by the prosecutor, the record does not establish how many other lesbians went unchallenged by the prosecutor. Nor do any other of the circumstances mentioned in *Wheeler* apply: The prosecutor did not use an extraordinary number of his peremptory challenges against lesbians; defendant does not claim the prosecutor's voir dire of these prospective jurors was unusually desultory or that in respects other than their sexual orientation the two were especially heterogeneous, and neither defendant nor any of the victims or percipient witnesses to the crimes were identified as lesbians at trial. No inference of discrimination has been raised.

We emphasize that we have discussed the various factual circumstances mentioned in *Wheeler* and other cases not as affirmatively showing the absence of discrimination but only as indications of why defendant did not meet his burden of raising an inference of discrimination. For example, that defendant was not a member of any of the actual or assumed cognizable groups involved (African-American women, Filipino-Americans, lesbians) neither proves the peremptory challenges against members of these groups were not discriminatory nor defeats defendant's motion as a matter of law; it merely identifies a factor that, because it is absent, fails in this case to support an inference of discrimination. It was defendant's burden to make a prima facie case. His attempt to do so fell short because he presented no factual circumstances other than the numbers of peremptory challenges used against each group—which in this case were too small to raise, by themselves, any inference of discrimination—and a record of voir dire that appellate counsel himself characterized as "unremarkable."

This court, like the trial court, has been able to determine that defendant made no prima facie case without hypothesizing permissible reasons that might have motivated the prosecutor's challenges. (Cf., e.g., *People v. Avila, supra,* 38 Cal.4th at pp. 553–556.) Consequently, we have found a comparison of the challenged prospective jurors and seated jurors neither necessary nor appropriate. Defendant acknowledges this court's past reluctance to perform such a comparative juror analysis for the first time on appeal (see *People v. Cornwell, supra,* 37 Cal.4th at p. 71), but argues our practice should be reevaluated in light of *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317].

In the circumstances of this first-stage *Wheeler-Batson* case, comparative juror analysis would make little sense. In determining whether defendant has made a prima facie case, the trial court did not ask the prosecutor to give reasons for his challenges, the prosecutor did not volunteer any, and the court

did not hypothesize any. Nor, obviously, did the trial court compare the challenged and accepted jurors to determine the plausibility of any asserted or hypothesized reasons. Where, as here, no reasons for the prosecutor's challenges were accepted or posited by either the trial court or this court, there is no fit subject for comparison. Comparative juror analysis would be formless and unbounded.

■ *Miller-El v. Dretke, supra,* 545 U.S. at pages 241–252, does not mandate comparative juror analysis in these circumstances. As we have previously explained, *Miller-El* arose at the third stage of a *Wheeler-Batson* inquiry, "after the trial court has found a prima facie showing of group bias, the burden has shifted to the prosecution, and the prosecutor has stated his or her reasons for the challenges in question." (*People v. Gray* (2005) 37 Cal.4th 168, 189 [33 Cal.Rptr.3d 451, 118 P.3d 496].) The high court did not consider whether appellate comparative juror analysis is required "when the objector has failed to make a prima facie showing of discrimination." (*Ibid.*) A fortiori, *Miller-El* does not mandate comparative juror analysis in a first-stage *Wheeler-Batson* case when neither the trial court nor the reviewing courts have been presented with the prosecutor's reasons or have hypothesized any possible reasons.

Defendant argues comparative juror analysis is appropriate here because defense counsel relied on such comparisons at trial. We disagree. Trial counsel asserted that the questionnaires of the two challenged African-American women were "nondescript" and contained nothing "controversial," and that one of the women was "about as neutral as any prospective juror." But counsel did not point to any specific questionnaire or voir dire of jurors the prosecution had accepted and thus did not make any actual comparisons between seated jurors and those the prosecutor had excluded. Moreover, as neither the prosecutor nor the trial court mentioned as reasons for their excusal the two women's questionnaire responses, voir dire or any other characteristic, there was nothing trial counsel could have focused on for such a comparison. Counsel's comments, in these circumstances, were too vague and general to impose on the trial court—or this court—a duty to compare these prospective jurors, as to unspecified criteria, to unnamed jurors accepted by the prosecutor.

## II. *Judicial Misconduct: Disparaging Remarks About Defense Counsel*

Defendant contends the trial court "overstepped the bounds of impartiality" by disparaging defense counsel in front of the jury, thereby depriving defendant of his federal and state constitutional rights to a fair trial by an impartial judge, due process, and a reliable determination of penalty. We disagree; in the context of the entire trial, the remarks complained of could not reasonably have been understood as reflecting bias against the defense.

Defendant's contention rests on four remarks by the trial court in the course of the two-month-long jury trial:

1. During the prosecution guilt phase case-in-chief, the court called a slightly early end to a day's testimony because no other witnesses were available. Court and counsel then discussed the next day's start time before excusing the jury:

"The Court: Okay. Well, we should not punish the attorneys for being efficient, so we'll just all stop for the day. It's only 15 minutes earlier than we would stop normally.

"Counsel, I think that we can just start at nine o'clock tomorrow. We have nothing we need to discuss before we proceed tomorrow?

"Mr. Sickels [the prosecutor]: Don't believe so.

"Mrs. Leonard [defense counsel]: Possibly.

"The Court: That means Ms. Leonard is going to go back to her office tonight and dream something up.

"Mrs. Leonard: Oh, that's not quite what I mean, your honor. There may be something—

"Mr. Liss [defense counsel]: Our objections are based on facts, not dreams.

"The Court: My question is, do you think we should bring the jury in at 9:15?

"Mrs. Leonard: I think that's a good idea, your honor, 9:15.

"The Court: Do you think we'll be more than 15 minutes?

"Mrs. Leonard: I hope not."

2. During the prosecutor's cross-examination of a defense guilt phase expert, defense counsel objected to the form of a question:

"Mr. Liss: Your honor, I am going to object at this point as being not only hearsay, but improper questioning, and that it appears at this point just [to] be wholesale reading of a report, and I would like to be heard at side-bar.

"The Court: Do you want to be heard at side-bar?

"Mr. Liss: Yes, your honor.

"The Court: Well, I think the objection will be overruled. I mean, we heard this objection just the other way yesterday and I ruled in your favor. This is all admissible, and you argued it was admissible yesterday and I agreed with you.

"Mr. Liss: Perhaps I am looking for questions, but I will leave it at that.

"The Court: Overruled."

3. During the same cross-examination, the prosecutor moved to strike a response as nonresponsive. The following discussion ensued:

"The Court: What was your—why don't you restate your question?

"Mr. Liss: Your honor, I'd ask that his question be reread. And this is responsive to it.

"The Court: I don't think you make friends with the court reporter when you do that. It's very hard for her to dig that out.

"Do you remember your question, or do I need to—if you don't, I'll have it reread."

4. At the end of penalty phase instructions, court and counsel discussed a number of issues during a recess. When the jury was brought back in, the court apologized for the delay, saying: "The attorneys managed to find a half dozen things to fight about during the recess."

■ "A trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution." (*People v. Carpenter* (1997) 15 Cal.4th 312, 353 [63 Cal.Rptr.2d 1, 935 P.2d 708].) The court's comments here did not create that impression.[7]

---

[7] The Attorney General argues the claim is forfeited by defendant's failure to object. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1108 [31 Cal.Rptr.2d 321, 875 P.2d 36].) As to the third and fourth remarks complained of, we agree. Defense counsel, however, expressly objected to the court's second remark out of the jury's presence, and, by his statement before the jury that "[o]ur objections are based on facts, not dreams" after the court's first challenged remark, counsel effectively indicated his objection to any judicial implication that he or cocounsel would "dream up" issues to discuss.

Regarding the court's first challenged comment, whether it was intended humorously (as the Attorney General argues) or would have been so understood by the jury is not entirely clear from the transcript. The trial record reflects a generally cordial relationship between the court and all counsel and includes a number of occasions on which the court and counsel made jokes or kidded one another. Defendant observes that such joking was mainly reserved for proceedings outside the jury's presence, as is of course appropriate, but we note the court later made an ironic comment very similar to the first remark complained of, but referring to *the attorneys generally*, in the jury's presence:

"The Court: . . . Mr. [K.], did you have a question?

"Juror [K.]: Your honor said nine o'clock?

"The Court: Are you saying that with a bit of skepticism because we never really start at nine?

"Juror [K.]: Wasn't sure. I am sorry, your honor.

"The Court: I suggest nine o'clock. It wouldn't surprise me, but what *the attorneys will think up something to talk about* between now and Monday, maybe I can get them to come in here Friday and talk about it if that's necessary. Hopefully we'll start just soon after nine o'clock." (Italics added.)

This suggests the earlier remark, too, was meant, and would reasonably have been taken, not as a serious attack on defense counsel's integrity but simply as an ironic way of conveying to the jury the court's uncertainty about the trial schedule. Both remarks suggest an attempt to cajole the jurors into patience with the proceedings partly by sardonically casting responsibility for delays on the attorneys. By the same token, the court made clear to the jurors that it was not seriously criticizing the lawyers; indeed, immediately before making the just quoted remark, the court expressly praised the attorneys' efficiency:

"The Court: . . . We should actually be quite grateful that the attorneys, all of them, have gotten right to the point and haven't wasted a lot of time in their questioning. I've certainly seen the opposite of that during my years as a judge, so I suspect that we are better off with attorneys like these attorneys who get right to the point."

In this context, we consider it unlikely that the first remark complained of was either intended or understood as a serious attack on the integrity of Defense Counsel Leonard.

The second remark complained of, unlike the first, was clearly meant seriously, and it could, as defendant argues, have been understood by jurors as a suggestion that defense counsel were "arguing out of both sides of their mouths," an implied criticism that would better be made out of the jurors' presence. In the setting of a protracted trial, however, the court's momentary and isolated expression of irritation with defense counsel did not indicate bias or suggest to the jury that the court was "allying itself with the prosecution." (*People v. Carpenter, supra,* 15 Cal.4th at p. 353.) The trial court also occasionally expressed annoyance at the prosecutor, including one occasion on which the prosecutor's request to approach the bench led to an extended sidebar discussion, after which the court called a recess and told the jury the court was "really not happy with these things coming up at the spur of the moment while the jury is sitting here that the court has not been advised of in advance."

The third remark complained of was not critical of defense counsel; the court merely stated its reason for preferring that the question be re-asked rather than read from the reporter's notes. The fourth comment, that "[t]he attorneys managed to find a half dozen things to fight about during the recess," did not expressly or impliedly criticize the defense. Even if meant or understood seriously, the comment was aimed at "the attorneys" generally. Neither of these remarks suggests bias or gives the impression of a judicial alignment with the prosecution.

We conclude the court's comments did not infringe on defendant's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article 1, sections 15 to 17 of the California Constitution.

### III. *Evidence of Lack of Remorse in Guilt Phase Trial*

During the prosecution case-in-chief, each of the two detectives who first interviewed defendant about the crimes testified, over defense objections, that during the interview (in which defendant admitted stealing from Mitchell's house but not killing Joey) defendant expressed no remorse for the crimes. Defendant contends this testimony was irrelevant and that its admission violated Evidence Code section 352 and his state and federal constitutional rights to a fair trial.[8] We disagree.

---

[8] The defense objections to the testimony of the first detective encompassed the grounds for exclusion raised on appeal. To the second detective's testimony, the defense objected only on

The central factual issue litigated in the guilt phase trial was whether, as the prosecutor alleged, defendant killed the victim to facilitate his thefts or, as the defense maintained, the thefts and killing were separate in their origins and purposes, the killing having occurred during a psychotic break in which defendant was motivated by displaced, long-repressed rage over his own treatment as a child. Defendant's apparent lack of remorse on the day after the crimes was relevant to this question because, if the defense version of events were true, one might reasonably expect defendant, upon recovering from the psychotic episode and realizing the senseless violence he had done, to feel tremendous remorse for his unprovoked killing of a child with whom he had felt empathy. As the trial prosecutor put it in response to the relevance objection, "if there was something evil within him to cause him to do this, he would be expressing remorse from day one, and there is no such expression."

Defendant notes that when the prosecution introduced the challenged testimony, the defense had not yet put forward the expert testimony supporting the defense theory. Relying on our statement that "unless a defendant opens the door to the matter in his or her own case-in-chief [citation], his or her remorse is irrelevant at the guilt phase" (*People v. Jones* (1998) 17 Cal.4th 279, 307 [70 Cal.Rptr.2d 793, 949 P.2d 890]), defendant argues he had not yet opened a door to proof of his lack of remorse. But defendant *had* already introduced the issue of his motivation for killing Joey. In her opening statement (made before the prosecution case-in-chief), defense counsel had already outlined the defense theory that defendant, on encountering Joey, felt "strange thoughts inside him . . . something pushing him to stab Joey," "something in him so evil he couldn't overcome it," which a psychologist would explain was "pent up rage, based on things that happened to him in his past," that made him kill the victim, and that afterward he could not remember the details of what he had done and wanted to get caught. Because remorse would more clearly be expected under this defense theory than under the prosecution theory of coldblooded robbery murder, by positing the defense theory even before the prosecution evidence had been presented "defendant himself placed the issue of his remorse into question." (*People v. Clark* (1993) 5 Cal.4th 950, 1016 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) The testimony was not irrelevant.

Nor did the trial court abuse its discretion in declining to exclude the evidence under Evidence Code section 352 as more prejudicial than probative. Immediately surrounding the questions regarding remorse and regret, the prosecutor asked the detectives whether defendant ever indicated "that he didn't know what he had been doing" during the incident and whether

the ground of the best evidence rule, a ground for exclusion that is not renewed on appeal. The appellate claim has thus been preserved as to the first but not the second detective. (Evid. Code, § 353.)

defendant was able to supply details of his activities on the day of the crimes. Thus, the context of the prosecutor's questioning made clear the evidence was being introduced not, as defendant asserts, to "punish [defendant] for his failure to express regret or remorse," but rather to rebut the defense theory— already outlined in defense counsel's opening statement—that defendant killed Joey during an irrational, rage-filled break from reality. As the evidence was probative on the central factual issue of the case, and as its introduction was clearly targeted to that issue rather than to creation of prejudicial emotion, we cannot agree with defendant that the court's choice to admit it was arbitrary or capricious. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) For the same reason, we reject the associated contention that introduction of the evidence violated defendant's constitutional rights to a fair trial by jury under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution.

Finally, any state law error in admitting the detectives' testimony was harmless. Evidence was later introduced showing that during defendant's second police interview, in which he admitted for the first time that he had killed Joey, defendant cried and told the interviewer that after "the drugs wore off" he had become upset at the realization of what he had done, and also showing that he expressed guilt and remorse when interviewed in jail by the defense psychologist. That the jury reached its verdicts by deciding to punish defendant for his lack of remorse, while ignoring the evidence defendant actually did express remorse, is not reasonably probable. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

IV. *Restriction on Expert Testimony*

Under Evidence Code section 352, the trial court excluded certain proposed testimony by Richard Levak, the defense psychologist, recounting defendant's statements regarding his killing of Joey. Defendant contends the ruling was error under the Evidence Code provision and deprived him of constitutionally due process. We disagree; the ruling did not constitute an abuse of the court's discretion and, in any event, did not affect the fairness of the trial.

During his interview with Levak, defendant had described his childhood abuse and his actions and thoughts during the crimes; defendant's statements on these matters were reflected in Levak's written report. Before Levak testified, the prosecutor objected to the psychologist "reciting specific statements made by the defendant to him . . . under the guise" of explaining the

basis for his expert opinion. The defense argued such statements were admissible, with a limiting instruction if necessary, under Evidence Code section 802 to show the basis for Levak's opinion.

The trial court ruled Levak could not testify "to what Mr. Bell told him about the events on June 4th," but could testify to defendant's statements regarding his "psychological background," including childhood abuse. In so ruling, the court expressly applied Evidence Code section 352, finding that a limiting instruction would be insufficient to prevent the jury from considering defendant's statements about the crimes themselves, as related by Levak, as evidence of the truth of the events, effectively permitting defendant to testify to his version of events without being subject to cross-examination. The potential for such prejudice was less as to defendant's psychological history, the court found, because that issue was less central to the case. Immediately before Levak testified, the court admonished the jury not to consider any statements of defendant related by Levak for their truth, but only as showing the basis for the expert's opinion.

■ The law governing this issue is well settled. "Expert testimony may . . . be premised on material that is not admitted into evidence so long as *it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions.* (Evid. Code, § 801, subd. (b); [citations].) . . . [¶] . . . And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.] [¶] A trial court, however, 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' (*People v. Coleman* (1985) 38 Cal.3d 69, 91 [211 Cal.Rptr. 102, 695 P.2d 189].)" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [59 Cal.Rptr.2d 356, 927 P.2d 713].)

"Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. ([*People v.*] *Coleman, supra,* 38 Cal.3d at p. 92.) [¶] Sometimes a limiting instruction may not be enough. In such cases, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. (*Coleman, supra,* 38 Cal.3d at pp. 91–93.)" (*People v. Montiel* (1993) 5 Cal.4th 877, 919 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

Defendant argues the trial court overestimated the prejudice that would result from allowing Levak to fully relate defendant's statements about the crimes. With regard to the efficacy of a limiting instruction, defendant contrasts this case with those involving inflammatory material that would inevitably prejudice the jury. (See, e.g., *People v. Coleman, supra*, 38 Cal.3d at p. 93 ["[a]ccusatory statements 'from the grave' "].) Nor, defendant argues, was the prosecution's inability to cross-examine him about his statements particularly prejudicial: The jury could assess defendant's credibility from his demeanor and responses in his videotaped confession to police. The Attorney General responds that defendant is merely asking the court to substitute "his own Evidence Code section 352 balancing process" for the trial court's.

While the potential for prejudice may not have been as great as suggested by the trial court, we agree with the Attorney General that the court's weighing of prejudice and probativeness was not arbitrary or capricious. (*People v. Rodrigues, supra*, 8 Cal.4th at pp. 1124–1125.) Though the excluded statements were not particularly inflammatory, for the jury to separate their proper and improper uses would have been difficult. And the chance to observe defendant's demeanor in a videotaped police interview the day after the crimes does not substitute for cross-examination regarding statements he made months later to a defense psychologist.

In any event, any error in the court's ruling was harmless. Ample evidence of defendant's statements about the crimes, forming a basis for Levak's opinion (and for the very similar opinion of Dr. Smith), was presented by both parties. In the videotaped confession, introduced in the prosecution case, defendant said he did not know why he had killed Joey, that he felt something evil "pushing" him and he "just flipped." Despite the court's ruling, on direct examination Levak testified without objection that "Mr. Bell described it [stabbing Joey] as feeling outside of himself, observing himself, almost observing in a trance like state." Smith, who had reviewed Levak's report as well as the videotaped confession, testified on direct examination that according to the materials he had reviewed, Joey and defendant had no negative interaction; Joey did not try to stop defendant from taking the television or boom box. In Smith's own interview with defendant, defendant "talked about evil forces coming into his head" and "described himself in this, when the actual killing was occurring, as watching himself doing it." Defendant said he "just repressed it until the next day during the confession." On cross-examination, Smith repeated that defendant "described to me" a sudden loss of contact with reality. Defendant told Smith he was not angry at Joey, who posed no threat to him. Defendant also told Smith that after the stabbing it was "almost like he didn't do it" and he "described" to Smith how during the videotaped interview "it came flooding back to him."

The court's ruling notwithstanding, then, the jury heard a great deal of evidence of defendant's statements about the crime to the police and the psychological experts. The statements to Levak excluded by the ruling would have been largely cumulative of this evidence.[9] The jury was fully informed of statements by defendant forming the basis for the experts' opinions that defendant killed Joey in a dissociative state, a brief break with reality, and not in order to facilitate his taking the television. There is no reasonable likelihood that admission of additional testimony by Levak on this point would have changed the jury's verdicts. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)[10]

Defendant also complains of the court's later ruling striking a question and answer during the prosecutor's cross-examination of Levak. As the prosecutor questioned Levak regarding his opinion of the psychological process leading to Joey's killing, the following exchange occurred:

"Q: So when he walked in the house and saw Joey watching television, and he was bent on stealing so he could buy more cocaine, all of a sudden he reverted back to when he was a child and remembered all the times he was in trouble in school?

"A: You make it sound trite.

"Q: No, I'm just trying to clarify what you just told us.

"A. Right. Oh, good. What I think happened is that he came home, and Joey was home watching TV. And he, in his statement, forgot the purpose of his visit momentarily.

"Mr. Sickels [the prosecutor]: Objection. Move to strike, your honor."

---

[9] The excluded statements were, in summary, that defendant and Joey were pleased to see one another; that while Joey was watching television defendant momentarily forgot why he had returned to the house; that when the idea of killing Joey came to him he resisted it, but it came back and "[f]rom then on I had no control"; that the stabbing felt to him "like a side event" to the thefts; and that later he did not consciously remember stabbing Joey, though he knew he had stolen the television and boom box. At the time of the court's ruling, defense counsel acknowledged that "most of it already frankly has been discussed one way or another."

[10] Nor, in light of the substantial amount of evidence admitted on this point and the largely cumulative character of that excluded, can we agree the challenged ruling deprived defendant of his rights to a fair trial, a meaningful opportunity to present a defense, or a reliable determination of the death penalty under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 15 and 17 of the California Constitution.

The prosecutor's "objection" was overruled,[11] and the witness continued his answer:

"A: Let me just calm myself. [¶] When he came home his statement was that he walked in the door, saw Joey home, was surprised that Joey was home, and started to talk to him and momentarily forgot why he was there and sat and talked to him. And then I think Joey went into the kitchen, from his statement.

"Mr. Sickels: Your honor, I'm going to object and move to strike this as beyond anything that I have inquired of this witness. He's purely volunteering information."

Rather than have the question reread by the reporter, as the defense suggested, the court sustained the prosecutor's "objection"[12] and told him to re-ask the question. The prosecutor then repeated his request to have the witness's answer stricken, to which the defense objected.

A lengthy discussion in chambers ensued. Defense counsel, citing Evidence Code section 356, argued that the prosecutor, by asking Levak to clarify his theory of how defendant's state of mind had changed when he encountered Joey, had opened the door for Levak to relate defendant's version of events; the prosecutor insisted the witness's answer was not responsive to his question. The court agreed with defense counsel that the prosecutor had opened a door to Levak's relation of defendant's statements, but observed that "this is a complete mess because of all the objections. And I'm going to just strike it all." Over a defense objection, the court told the jury it was striking "both the last question by the district attorney, as well as the last answer by the witness." The prosecutor continued his cross-examination on a different topic.

We agree with the trial court and the defense that the prosecutor, by asking Levak to "clarify" how defendant could have "all of a sudden" lost his focus on stealing the television when he unexpectedly encountered Joey, opened the door for Levak to explain further the basis for his opinion about defendant's mental processes during that encounter, including the relation of statements defendant made to him on that subject. Levak's answer was thus responsive to the prosecutor's question.

---

[11] What the prosecutor objected to was not clear—presumably it was not to his own question. A nonresponsive answer is properly the subject of a motion to strike (Evid. Code, § 766), not an objection.

[12] See footnote 11, *ante*.

Moreover, we agree with defendant that it was error to strike the question and answer. Having asked the proverbial "one question too many" and received an answer he did not like, the prosecutor was not entitled to turn back the clock. Although the record of objections and motions may have been in a "confused state," as the trial court said, the prosecutor's question and Levak's answer were clear enough. The *evidence* was not in a particularly confused state, and there was no apparent reason to strike it.

Nevertheless reversal is not required. As discussed above, the jury was fully informed, through the videotaped confession and the testimony of Levak and Smith, of defendant's version of his encounter with Joey, which formed one of the bases for the experts' opinion that defendant killed Joey in a dissociative state connected to a transient psychotic break with reality. In particular, they knew defendant had said he did not know why he had killed Joey rather than just take the television, that he felt pushed to do so by an evil feeling, and that he experienced the killing as if watching himself do it. The jury was not reasonably likely to reach a different verdict had it also considered, as a basis for the expert opinions, defendant's statement that, on encountering Joey, he "momentarily forgot why he was there and sat and talked to him" for some period before stabbing and kicking him to death and stealing the television and boom box.

## V. *Court's Treatment of Holdout Juror*

Defendant contends the court erred in its response to a jury note regarding an 11-to-1 impasse in guilt phase deliberations and erred again by inadequately investigating the holdout juror's later claims of intimidation. These errors, defendant claims, led to the juror's discharge and the return of guilt verdicts by the reconstituted jury. We disagree; the trial court did not abuse its discretion in either respect.

The claim's factual background is as follows:

The jury began its guilt phase deliberations at 2:20 p.m. on Tuesday, November 16, 1993, and was excused for the day at 4:00 p.m. The next day, Wednesday, November 17, deliberations began at 9:00 a.m. At 9:40 a.m. the jury sent out a note (jury note No. 19) asking for clarification of the phrase "accomplished by" in the court's instruction that one element of the robbery charge was that the taking of property "was accomplished either by force, violence, fear or intimidation." With the agreement of counsel, the court told the jury it could not further define the instructional phrase. At 10:39 a.m. the jury withdrew to resume deliberations, which continued until 4:00 p.m.

On Thursday, November 18, the jury again resumed deliberations at 9:00 a.m. At 1:45 p.m. the jury sent out a note (jury note No. 20) indicating an impasse in the deliberations. The note, which was signed by the foreman, Juror Mark D., read: "We have not been able to arrive at a verdict. Specifically, we have one jury member who can not find 'the taking was accomplished either by force, violence, fear or intimidation.' "

Out of the jury's presence, the court proposed to have the jury resume deliberations with the following admonition, which the court observed was based on one approved in *People v. Rich* (1988) 45 Cal.3d 1036, 1116–1117 [248 Cal.Rptr. 510, 755 P.2d 960]: "This has been a long trial. The evidence was extensive. The legal issues are complex. Reasonable people could disagree. However, at the time I received your note the jury had been deliberating less than three days. In my opinion you may not have been deliberating long enough to discuss this case fully and to understand fully each other's viewpoint. Please continue your deliberations."

Defense counsel objected, urging the court instead to inquire of the jurors whether they believed themselves hopelessly deadlocked and, if they did, to declare a mistrial. Otherwise, counsel suggested, the court risked setting the stage for the jury majority to coerce the holdout juror into a verdict. If the court was not willing to inquire of the jurors, counsel concluded, the defense asked for a mistrial. The prosecutor pointed out the jury had been deliberating less than *two* days after a month and a half of trial, and urged the court not to consider a mistrial. The trial court overruled the defense objection, denied the mistrial motion, and admonished the jury as proposed, while correcting the reference to deliberation time from less than three days to less than two.

The jury returned to the jury room at 2:20 p.m. At 4:00 p.m. they were excused for the day. At the same time, the court received an additional note (jury note No. 21). This note, from Juror No. 11, Aron G., stated: "Sir, I am in psychological pain. I wish to be excused from this jury. I feel the level of intimidation from a couple of jurors toward me that make this process impossible. I am emotionally battered by this situation and can no longer tolerate the strain. I am very sorry but I can no longer function in this environment."

Discussing jury note No. 21 after the jury had left, the trial court agreed with defense counsel that the jury should not be asked to deliberate further until the court decided how to respond. Because of the court's schedule of other matters, however, it was impossible to research and discuss the proper response until the afternoon of the next day. With agreement of counsel for both sides, the court decided to excuse the jury the next morning for the weekend, giving them a cooling-off period, and to meet with counsel later on Friday for discussion.

At 9:00 a.m. the next day (Friday, Nov. 19), over defense objections that it could increase the pressure on Juror Aron G., the court examined her briefly without the other jurors present, asking if her "position has changed from the note you left us last night." The juror answered, "No," and left the courtroom. Defense counsel then requested that the court admonish all the jurors to show each other "respect and courtesy," so they would have the weekend to "mull that over." Denying that request, the court excused the jurors until Monday morning, telling them that "a legal issue concerning deliberations has come up."

On the afternoon of Friday, November 19, the court and counsel discussed Aron G.'s allegation of "intimidation" by other jurors and her request to be excused from the jury. The defense again requested a mistrial, which was again denied. Alternatively, the defense requested that the court admonish the jurors to "listen to each other and use a reasoned approach," to "be civilized and reasonable and fair." While indicating it would consider that request, the court also stated that it wished counsel to be prepared with questions they would like asked of Aron G. and, if further inquiry proved necessary, of the other jurors, regarding the course of deliberations.

By the time court next convened, however, at 9:30 a.m. on Monday, November 22, 1993, the situation had changed again: The court had received a two-page typed letter (jury note No. 22) from the holdout juror, Aron G. Apologizing for the trouble she had caused the court, the juror explained that she was "as close to an emotional breakdown as I have ever been in my life, which is very frightening and disorienting for me." She then revealed that on the previous Thursday night, "I broke down and discussed the case and deliberation process with my husband." She knew doing so violated the court's directions, but "in an extremely traumatic and emotional state" she felt she "had to confide in someone, or just go crazy."

In the letter, Aron G. then gave some "background" regarding the course of deliberations. The jury, she wrote, had quickly resolved all the elements of robbery except the fourth one listed in the instruction, whether the taking was accomplished by force or fear; the remaining deliberation time was taken on this one question. While most of the jurors were sensible and fair, "as time went by a couple became increasingly impatient and frustrated, which eventually precipitated the personal attack and conveniently overheard sarcastic and demeaning comments about my intelligence and decision making skills." She also overheard jurors talking about the "time waste, cost and inconvenience" of the continuing deliberations; these remarks, though not directed at her, made her feel more "isolation and duress."

When Aron G. "confronted the parties involved," she was told she had " 'misunderstood' " and that if remarks were made, they were " 'unintentional.' " Although she continued to believe the remarks were indeed "most pointedly intended," she also acknowledged that she could be, as her husband suggested, naive about "the ways of the civilian and judicial world"[13] and that "intimidation," the term she had used in her prior note, might be "a harsh and excessively powerful word" to describe the other jurors' behavior.

The defense renewed its request for a mistrial. The court stated it would either have to declare a mistrial or substitute an alternate for Aron G.; her misconduct and emotional state made it impossible for the court to retain her as a juror. The court decided to examine Aron G. and the jury foreman, Mark D., in an attempt to discover whether any jurors besides Aron G. had committed misconduct.

Questioned by the court, Aron G. said that despite getting some prescription drugs that helped calm her down over the weekend, she still felt as described in her letter. She did not believe she would function well as a juror and "I just don't think I would be impartial at this phase any more." She clarified that she had discussed the facts of the case, as well as the deliberations, with her husband. With regard to the "intimidation"—a term she acknowledged some people might not find applicable—she explained that after a long period of building tension between her and the other jurors, the comment that "pushed me over the brink" was made by Juror S. While the jury was examining a photographic exhibit showing the victim's stab wounds, Juror S. said something like: "You think this is crazy. What's really crazy is anyone who can look at all this and not see that a robbery was committed. That's what's really crazy." In response, Aron G. yelled back that she would not tolerate personal attacks. At that point, "there was a lot of yelling and screaming until everybody kind of calmed down."

Jury Foreman Mark D., also questioned by the court, denied there had been any intimidation during deliberations. Although Mark D. admitted that he and Juror S. were both "very strong opinionated individuals," he denied S. had said anything intimidating to Aron G.: "[I]n fact . . . there was one instance that specifically gave rise to this whole situation that was totally misinterpreted by Ms. [G.]" The court refused a defense request to ask Mark D. about jurors' comments concerning waste of time and money.

At the completion of its inquiry, the court decided not to declare a mistrial but instead to excuse Aron G. and swear an alternate juror to replace her.

---

[13] The juror's letter referred to her "16 year Naval career," during which she had never been reduced to an "uncontrollable emotionality" as she had by deliberations, and observed that the type of personal attacks she suffered were "not tolerated in the Navy."

"The court's not convinced that there was any misconduct by way of intimidation in the jury room. Gosh, if anything, it sounds like typical deliberations. And the problem is the only misconduct we're left with is Ms. G[.] discussing the case with her husband." Defense counsel objected that the court's inquiry had been insufficient: Given that Aron G. had referred to "a couple" of jurors intimidating her, and that Mark D. admitted that he and Juror S. were the most aggressive jurors, "the court cannot turn its back on the possibility that Mr. [D.] perhaps was intimidating her as well." Counsel urged the court to interview all the jurors about possible intimidation.

Denying the defense request for further investigation, the court excused Aron G., finding good cause (§ 1089) in her failure to follow the admonition not to discuss the case with others and in her statements that she could no longer be impartial and was emotionally unable to continue. The court then swore in an alternate juror and instructed the jury to begin deliberations anew. At 11:07 a.m. the jury resumed deliberations. By 2:02 p.m. the same day (Monday, Nov. 22, 1993) they had reached their guilt and special circumstance verdicts.

Defendant contends the trial court erred in several respects.

■ First, he asserts the court abused its discretion when, in response to jury note No. 20, the court denied a mistrial without inquiring of the jurors whether they were hopelessly deadlocked. As defendant acknowledges, the question whether to declare a hung jury or order further deliberations rests, as both statute and case law provide, in the trial court's sound discretion. (§ 1140 [jury may be discharged without reaching a verdict if, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree"]; *People v. Proctor* (1992) 4 Cal.4th 499, 539 [15 Cal.Rptr.2d 340, 842 P.2d 1100]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 775 [230 Cal.Rptr. 667, 726 P.2d 113].) "Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived ' "as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." ' " (*Proctor*, at p. 539.)

We conclude the denial of a mistrial without further inquiry was not an abuse of discretion on the facts here. While the trial court has a duty to avoid coercing the jury to reach a verdict, we have held that inquiry as to the possibility of agreement is "not a prerequisite to denial of a motion for

mistrial." (*People v. Rodriguez, supra*, 42 Cal.3d at p. 777.) Moreover, the jury in this case had deliberated less than two full days, around 10 hours; we have upheld courts' denials of mistrials even after fruitless deliberations for longer periods. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 194–197 [14 Cal.Rptr.2d 342, 841 P.2d 862] [jury had deliberated for more than 14 hours over five days]; *Rodriguez*, at pp. 774–775 [11th day of deliberations].)

Defendant asserts that the guilt phase trial in his case was not "long, the evidence voluminous, and the issues complex" as in *People v. Rodriguez, supra*, 42 Cal.3d at page 775. We disagree. While not extraordinarily long for a special circumstances murder trial, defendant's guilt phase trial featured extensive and complicated testimony by toxicological, pharmacological, and psychological experts called by both sides, who differed sharply with one another over both their technical conclusions and their overall assessments of defendant's mental state at the time of the crimes. The question of fact on which the jury was troubled—the relationship between defendant's theft of the television and boom box and his killing of Joey—was at the center of this complex expert debate. For the trial court to conclude that extended deliberations might be necessary was not unreasonable.

Defendant also argues the order for further deliberations was coercive because the trial court knew (from the foreman's unprompted revelation in jury note No. 20) that the jury was split 11 to 1 for conviction and that the split involved an issue (whether the taking of property was accomplished by force or fear) that had troubled the jury since early in its deliberations. But while we have recognized the increased "*potential* for coercion once the trial judge has learned that a unanimous judgment of conviction is being hampered by a single holdout juror" (*People v. Sheldon* (1989) 48 Cal.3d 935, 959 [258 Cal.Rptr. 242, 771 P.2d 1330]), we have rejected the view that denial of a mistrial in that circumstance is "inherently coercive" (*ibid.*). Despite the 11-to-1 split, the trial court could reasonably believe further deliberations would lead to a unanimous understanding of the case among the jurors. With hindsight, we know that the court's hopeful expectation was not to be fulfilled. But the trial court's failure to guess correctly how the further deliberations would go does not make its order an abuse of discretion.

Second, defendant contends the trial court, in its instruction ordering further deliberations so that the jurors could come "to understand fully each other's viewpoint," impliedly suggested the holdout juror should change her mind. The court, defendant argues, should instead or in addition have instructed the jury that "the jurors [have] an individual duty to deliberate and to reach their own conclusions, rather than merely acceding to the majority view." We disagree; the court's admonition was not of a character that would expressly or impliedly coerce a verdict. (Cf. *People v. Sheldon, supra*, 48

Cal.3d at pp. 959–960 [giving examples of coercive admonitions].) Nor, for reasons already explained, do we agree with defendant that the court erred in telling the jury: "This has been a long trial. The evidence was extensive. The legal issues are complex." While there were differences between this case and *People v. Rich, supra*, 45 Cal.3d at pages 1116–1117, in which we approved a similar explanation of the need for further deliberations, the trial court's explanation here was tailored to the case before it and did not constitute an abuse of discretion.

Third, defendant faults the trial court for an inadequate investigation of matters mentioned in Juror Aron G.'s letter. Specifically, defendant contends the court should have sought more detail from Aron G. as to the contents of her discussion with her husband about the case and the effect of the incident on her, and should have interviewed jurors besides Aron G. and Mark D. regarding intimidation during deliberations.

As to the contents of Aron G.'s conversation with her husband and her ability to continue deliberations, we disagree more inquiry was needed. Asked whether she and her husband had discussed "the facts of the case" or only "the deliberation process," Aron G. answered: "I gave him the background as to why the problems were occurring, so yes, I discussed the facts concerned [*sic*] the points I addressed in there about the robbery and the problems, I mean, my sense of the problems within the room, yes, sir." With regard to her ability to continue, Aron G. volunteered that she was sorry for what she had done, but "I just don't think I would be impartial at this phase any more." No further questioning was necessary in order to conclude that Aron G. had intentionally violated the court's admonition against discussing the case with outsiders and could no longer serve as an impartial juror.

As to other jurors' views of whether intimidation had occurred, the trial court acted within its sound discretion in concluding that further questioning would be an unwarranted intrusion into the secrecy of jury deliberations. (See *People v. Burgener* (2003) 29 Cal.4th 833, 878–879 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Cleveland* (2001) 25 Cal.4th 466, 475–476 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) Though Aron G. initially (in jury note No. 21) referred to "intimidation" by "a couple of jurors," in her subsequent letter she volunteered that that description might have been "harsh and excessively powerful." Interviewed by the court, she repeated that her perception of intimidation might have been idiosyncratic and "naive." When pressed for actual instances, she gave only one, a comment by Juror S. to the effect that Aron G. was herself "crazy" for accepting the defense psychological theory. In response, she recounted, she had "yelled" that she would not tolerate personal attacks, which led to generally raised voices until eventually the jurors "kind of calmed down." The foreman, Mark D., agreed there was

"one instance" with Juror S. that gave rise to Aron G.'s complaints, but insisted she had "misinterpreted" it and that apologies had been made. With this information, the trial court could reasonably conclude there had been no actual intimidation of Aron G. by S. or other jurors, but only the type of heated discussion common to jury deliberations, and that to interview all the jurors, as the defense urged, would be to risk " ' "depriv[ing] the jury room of its inherent quality of free expression." [Citation.]' " (*Cleveland*, at p. 476.)[14]

■ The trial court reasonably found Aron G.'s emotional reaction to the deliberations led to her own misconduct and inability to continue deliberating. Unfortunate as these events may have been, they were not the result of judicial error. The court did not, as defendant contends, effectively coerce a verdict in violation of his rights to due process, a fair jury trial, and a reliable determination of penalty under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16 and 17 of the California Constitution.

## VI. *Unconstitutionality of California's Death Penalty Statute*

Defendant presents no claims of error specific to his penalty trial, but contends generally that California's death penalty statute and procedures are unconstitutional for a number of reasons. Defendant again cites the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16 and 17 of the California Constitution. We have recently and repeatedly rejected these general claims and do so here as well without extensive discussion.

The special circumstances listed in section 190.2, together with other aspects of California homicide law, adequately narrow the class of murderers eligible for the death penalty. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229]; *People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Snow* (2003) 30 Cal.4th 43, 125–126 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

Section 190.3, factor (a), permitting the jury to consider the "circumstances of the crime" as a factor in aggravation or mitigation, is not so vague as to allow for unconstitutionally arbitrary application and is not otherwise constitutionally improper as a sentence selection factor. (*Tuilaepa v. California*

---

[14] Nor do we agree with defendant that the court was required to inquire of the jurors concerning remarks about cost and waste of time that Aron G. recounted overhearing outside of deliberations. While the expense and inconvenience of a trial is irrelevant to guilt or innocence and reference to it in a court's instruction is thus improper (*People v. Barraza* (1979) 23 Cal.3d 675, 685 [153 Cal.Rptr. 459, 591 P.2d 947]), we know of no authority suggesting that a report of jurors grumbling among themselves over the length of deliberations indicates misconduct requiring investigation.

(1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Proctor, supra,* 4 Cal.4th at pp. 550–551.)

Our statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow, supra,* 30 Cal.4th at p. 126.) No instruction on burden of proof is required in a California penalty trial because the assessment of aggravating and mitigating circumstances required of penalty jurors is inherently " 'normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118]; accord, *People v. Demetrulias, supra,* 39 Cal.4th at p. 43; *People v. Gray, supra,* 37 Cal.4th at p. 236.)

*Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], requiring that certain sentencing findings be made by a jury, are inapposite for reasons previously explained: " '[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*' [(*People v. Anderson* (2001) 25 Cal.4th 543, 589–590, fn. 14 [106 Cal.Rptr.2d 575, 22 P.3d 347].)] The high court's recent decision in *Ring v. Arizona*[, *supra,*] 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603 [122 S.Ct. at p. 2440].) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt." (*People v. Snow, supra,* 30 Cal.4th at p. 126, fn. 32; accord, *People v. Demetrulias, supra,* 39 Cal.4th at p. 41.)

"[W]e also disagree with defendant that our statute is unconstitutional because it does not require jurors to agree unanimously on the existence of particular factors in aggravation. [Citations.] While all the jurors must agree death is the appropriate penalty, the guided discretion through which jurors reach their penalty decision must permit each juror individually to assess such potentially aggravating factors as the circumstances of the capital crime (§ 190.3, factor (a)), prior felony convictions (*id.*, factor (c)), and other violent criminal activity (*id.*, factor (b)), and decide for him- or herself 'what weight that activity should be given in deciding the penalty.' [Citation.] The series of normative judgments involved in deciding whether a particular circumstance is indeed aggravating and, if so, what weight it should be given, cannot be fitted into a scheme of unanimous jury factfinding." (*People v. Demetrulias, supra,* 39 Cal.4th at p. 41.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*People v. Snow, supra,* 30 Cal.4th at p. 126; accord, e.g., *People v. Gray, supra,* 37 Cal.4th at p. 237; *People v. Stitely, supra,* 35 Cal.4th at p. 574.)

" 'International law does not compel the elimination of capital punishment in California.' (*People v. Snow, supra,* 30 Cal.4th at p. 127.) Defendant's argument that the use of capital punishment 'as *regular punishment* for substantial numbers of crimes' violates international norms of human decency and hence the Eighth Amendment to the United States Constitution fails, at the outset, because California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239, subd. (b).)" (*People v. Demetrulias, supra,* 39 Cal.4th at pp. 43–44.)

## VII. *Cumulative Prejudice from Errors*

We have identified one error at trial, the court's decision to strike, at the prosecutor's request, a question and answer on cross-examination of a defense expert. (See pt. IV., *ante.*) Having concluded that error was harmless, we reject defendant's contention that the cumulative prejudicial effect of the court's asserted errors requires us to reverse his conviction and death sentence.

## Disposition

The judgment of the trial court is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied March 28, 2007.