Filed 8/27/13  P. v. Alphonso CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061986 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD235703) |
| ASA ANTHONY ALPHONSO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, George W. Clarke, Judge.  Affirmed as modified and remanded with directions.

Tracy A. Rogers under appointment of the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

In this domestic violence and rape case, a jury found Asa Anthony Alphonso guilty of nine felony offenses against Michelle C.[1] during two incidents as follows: two counts of inflicting corporal injury on a cohabitant (counts 1 & 6: Pen. Code,[2] § 273.5, subd. (a)); two counts of false imprisonment by violence (counts 2 & 7: §§ 236 & 237, subd. (a)); one count of assault with a deadly weapon (a knife) and force likely to cause great bodily injury (count 3: § 245, subd. (a)(l)); one count of assault by means of force likely to cause great bodily injury (i.e., suffocation) (count 4: § 245, subd. (a)(l)); one count of attempting to dissuade a witness from reporting a crime (count 5: § 136.1, subd. (b)(l)); one count of forcible rape (count 8: § 261, subd. (a)(2)); and one count of making a criminal threat (count 9: § 422).

In addition, the jury found true allegations that in committing the count 6 offense of inflicting corporal injury on a cohabitant Alphonso personally used a deadly or dangerous weapon (a lit cigarette) within the meaning of sections 12022, subdivision (b)(1) and 1192.7, subdivision (c)(23). Alphonso admitted he had sustained three prior prison term convictions (§ 667.5, subd. (b)) and two prior strike[3] convictions (§ 667, subds. (b)-(i)).

---

[1]    In the interest of protective nondisclosure, we will refer to Michelle C. by her first name. We intend no disrespect.

[2]    Undesignated statutory references will be to the Penal Code.

[3]    "We use the term 'strike' to describe a prior felony conviction that qualifies a defendant for the increased punishment specified in the Three Strikes law." (*People v. Fuhrman* (1997) 16 Cal.4th 930, 932, fn. 2.)

At the sentencing hearing, the court denied Alphonso's motion for a new trial, which was based on his claim of newly discovered evidence and also denied his motion to dismiss one of his prior strikes.  The court sentenced Alphonso for his count 8 rape conviction to a prison term of 25 years to life, plus a consecutive term of three years for the three prison priors, and to a consecutive term of 25 years to life for his count 3 conviction of assaulting Michelle with a deadly weapon and force likely to cause great bodily injury, plus a consecutive term of three years for the prison priors.  For each of the remaining seven counts (counts 1, 2, 4, 5, 6, 7 & 9), the court imposed a concurrent term of 25 years to life, plus three years for the prison priors.  Thus, the court imposed a total prison term of 50 years to life plus six years.

Alphonso raises three contentions on appeal.  First, he contends the court violated his rights under the federal Constitution and committed reversible error during jury selection when defense counsel made a *Batson/Wheeler*[4] objection that the prosecutor had used peremptory challenges to "eliminate[] every minority juror that's been on the panel so far," and the court ruled the defense had failed to meet its threshold burden of making a prima facie case of group bias discrimination.  Second, he contends the court prejudicially abused its discretion and violated his right to present a defense by denying his motion for a new trial based on newly discovered evidence.  Last, he contends his sentences on counts 1, 2, 4, 6, 7 and 9 should have been stayed under section 654.  We modify the judgment to stay the execution of the concurrent sentences of 25 years to life,

---

4    *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

plus three years, that the court imposed for Alphonso's conviction of counts 1, 2, 4, 6, 7, and 9. In all other respects, we affirm the judgment and remand the matter with directions.

FACTUAL BACKGROUND

A. *The People's Case*

Michelle testified that she met Alphonso through an online dating service as she was going through a divorce, and they had an "off and on" two-and-a-half-year relationship that ended in July 2011. The two were cohabitating at her apartment in San Diego at the time the crimes were committed in this case. Alphonso was nice and friendly when their relationship started, but he became verbally and physically abusive over time. He accused Michelle of dating other people and called her names like "[w]hore, slut, bitch, [and] stupid."

Alphonso first used physical violence against her after about a year, when he grabbed her arm in her bedroom, twisted her hand behind her back, and pushed her neck and head forward, causing her head to hit a bench. Alphonso apologized, and Michelle stayed with him because she believed he was sorry and would not do it again.

Thereafter, for more than half a year, Alphonso verbally abused Michelle, but did not physically abuse her. Although she tried to break up with him many times, she would end up reconciling with him when he was nice to her.

4

After they broke up in February 2011, Alphonso sent texts and phone messages to Michelle in which he threatened to ruin her by sending naked photographs of her to her mother, children and family. He then posted naked photographs of her on Craigslist. Michelle called the police and also called Craigslist to have them remove the photographs. She reconciled with Alphonso about a month later because he apologized to her, she loved him, and she hoped they could stay together. However, Alphonso resumed the physical and verbal abuse.

Michelle testified that Alphonso held her hostage in February 2011. She tried to leave her apartment when Alphonso became very angry, but he grabbed her, pushed her back inside, and locked the door. When she then tried to leave through the sliding glass door, he again grabbed her, pushed her back inside, locked that door, shut the curtains, turned up the music, and told her, "That's so nobody can hear you screaming." Michelle stayed on the couch for several hours and did not call for help because Alphonso was angry and violent, and she did not want to get hurt. Alphonso eventually calmed down and apologized. Michelle did not call for help because she believed Alphonso would kill her if she did so.

*Counts 1-5 and 9*

On July 19, 2011—the date of the first incident on which counts 1-5 were based in this case[5]—Alphonso again held Michelle hostage, this time in her bedroom for nine hours. She testified she had been sick and was lying down on her bed in the afternoon when Alphonso arrived. He was angry that she was still lying down and accused her of being up all night sleeping with other men. He yelled at her, spat on her, and called her names. Michelle tried to escape through the door before Alphonso got too angry, but he grabbed her, pushed her, told her to return to the bedroom, and locked the door. Alphonso told her to stay on the bed and took her phone. When Michelle's mother called her, Alphonso answered the phone and told her Michelle was a bad person.

During this incident, Alphonso kicked Michelle's leg, causing bruising and swelling. He also hit her calf where he had recently tattooed his first name even though she was reluctant to have him do so. The tattoo was infected, red and swollen. Alphonso also hit her in the head and face with an open hand 20 to 30 times, hit her in the head with the remote control, grabbed her hair and banged her forehead against the wall, and twice cut off her breath by smothering her with a pillow. When Michelle went to the bathroom, Alphonso grabbed her hair, took a knife out of a drawer, held it against her temple, and told her to look at the knife because he was going to kill her with it. Alphonso also

---

5    The information charged Alphonso in counts 1 through 5 with corporal injury on a cohabitant, false imprisonment by violence, assault with a deadly weapon, assault by means of force likely to cause great bodily injury, and attempting to dissuade a witness, respectively, and alleged he committed these offenses on or about July 19, 2011.

6

threatened to kill her when she was on the bed. He restrained her by holding her arms against the bed and sitting on her legs.

After the ordeal, Michelle had bruises and lumps all over her forehead and bruising around her eyes from being hit in the eye with the hard part of a stuffed animal. She testified she did not leave after Alphonso calmed down because he threatened to kill her if she left or tried to get help.

The next day, Michelle cancelled her appointment with her therapist, Sandra Gorchow, because Alphonso did not want Gorchow to see Michelle's bruised eye.

*Counts 6-9*

The second incident—on which counts 6-9 were based[6]—occurred on July 21 or 22 and lasted about six hours. Alphonso again accused Michelle of sleeping with other men. She testified that when she saw him getting angry, she thought, "Here it goes again." She did not try to leave, and she complied when Alphonso told her to get on the bed. He told her he was going to burn her with cigarettes. He went outside to get the cigarettes because she did not allow smoking inside the apartment. She could have locked him out on the balcony when he went to get the cigarettes, but she did not do so. Michelle testified that when Alphonso returned, he lit a cigarette, sat on the bed, grabbed her legs, pulled them over to him, and "started burning [her] feet and upper—or lower part of [her] right leg." He burned her eight times and it was very painful.

---

[6]     The information charged Alphonso in counts 6 through 9 with corporal injury on a cohabitant, false imprisonment by violence, forcible rape, and making a criminal threat, respectively, and alleged he committed these offenses on or about July 21 and 22, 2011.

Michelle also testified that Alphonso threatened to kill her "many times" that day. He threatened to put a wet towel over her, tie her up, and let the cats eat her. He talked about slashing her face, knocking her teeth out, peeling her fingernails back, and breaking her fingers. Alphonso repeatedly hit her on the head with the remote control and with his hand. Toward the end of the six-hour incident, Alphonso told Michelle he was going to rape her, ordered her to remove her clothes, and then engaged in forcible sex with her, causing her pain.

*Reporting of the Incidents*

A few days later, Michelle went to an appointment with her therapist. She put makeup on her facial injuries so that her therapist would not see them, but she did not cover up the cigarette burns. Michelle did not disclose the domestic violence to her therapist because she knew the therapist would call the police; and Michelle feared Alphonso would kill her.

At the end of the session, the therapist suggested that she meet with Alphonso and explain to him that it was appropriate for her to work with him and Michelle for couple's therapy. Michelle texted Alphonso about meeting with the therapist, and she and her therapist picked up Alphonso and drove him to Michelle's apartment to talk.

When the three arrived at the apartment, the therapist started talking about couple's therapy. The therapist testified that Alphonso "became exceptionally animated," angrily paced around, and almost berated her. The therapist eventually told Michelle and Alphonso she had to leave.

8

Michelle walked with her therapist to the therapist's car, started crying, and said, "I'm not going to go back in there" or "I can't go back in there." The therapist told her to get in the car, and she did. Alphonso approached the car and asked, "Why are you doing that? Don't get in the . . . car. Why do you want her in the car? Where are you taking her? We can talk." Alphonso was standing in front of the car and leaning on the hood. When he moved to the side, the therapist drove the car away.

After they drove away, Michelle started telling the therapist about what had happened and said Alphonso would kill her if the therapist called the police. Michelle showed her the bumps and bruises she had covered with makeup and the cigarette burns on her ankle and foot. She had her therapist feel the bumps on her scalp.

The therapist called 911 when Michelle went to the bathroom at a store. When Michelle returned to the car, the therapist was still on the phone with the 911 dispatcher. After the call, the two sat in the car until the police arrived. The therapist spoke with them first, and then Michelle reluctantly spoke to them. The therapist testified that Michelle appeared to be extremely fearful.

San Diego Police Officer Steve Sdringola testified he responded to the 911 call. Michelle initially did not want to talk to him. Officer Sdringola accompanied the two women back to the victim's apartment. Michelle told him she and Alphonso had been together for two and a half years and that in the last six months there had been at least 10 incidents of physical abuse by Alphonso. She told him in particular about the two incidents on July 19 and July 21 or 22. However, she did not tell him that Alphonso had raped her, and she made no mention of Alphonso's alleged threats to starve her and let her

9

cats eat her, or break her fingers, or smother her with a wet towel, or slash her face. At trial, Michelle indicated she did not provide as much information as possible to the officer because she still feared Alphonso and she was protecting him both for his sake and hers.

Officer Sdringola testified he saw eight small, round, apparent burn marks on Michelle's foot; and also saw raised bumps and bruising on her head. Another officer photographed the injuries.

A clinical psychologist with the San Diego Family Justice Center testified about the cycle of abuse in domestic violence, which starts with the "honeymoon" phase, proceeds to the tension-building phase, escalates to the acute battering phase and repeats. To maintain power and control, batterers may engage in intimidation and emotional abuse, may isolate the victim, may minimize or deny the abuse and blame others for their own behaviors, may use children, and may use coercion and threats. As defense mechanisms, victims may minimize, rationalize, or justify the abuse to stay in the relationship. The psychologist testified it is difficult for victims of abuse to speak out about sexual violence in the relationship.

The parties stipulated that Michelle mentioned for the first time at trial two specific prior acts of domestic violence in which Alphonso pushed her, took her keys, and pushed her against a wall.

B. *The Defense Case*

Alphonso's defense was that Michelle was lying and he did not commit any of the charged crimes. Two residents of the apartment complex where Michelle lived testified they did not hear any loud arguments at the complex in July 2011. Also, a witness who performs computer and telephone forensic evaluations testified that he examined phone records for the month of July 2011 for a phone number assigned to Michelle. Michelle's cell phone records indicated several calls were made from and received on her cell phone on July 19, 21 and 22, including incoming and outgoing calls to her mother and sister.

DISCUSSION

I. *OVERRULING OF ALPHONSO'S BATSON/WHEELER OBJECTION*

Alphonso first contends the court violated his rights under the federal Constitution and committed reversible error during jury selection when defense counsel made a *Batson/Wheeler* objection by asserting that the prosecutor had used peremptory challenges to "eliminate[] every minority juror that's been on the panel so far," and the court ruled the defense had failed to meet its threshold burden of making a prima facie showing of group bias discrimination. We reject this contention.

A. *Background*

During voir dire—after the prosecutor exercised seven peremptory challenges to excuse prospective jurors 9, 15, 11, 7, 22, 26, and 8 in that order—Alphonso's counsel requested a sidebar conference. Outside the presence of the prospective jurors, defense counsel complained that the prosecutor had used peremptory challenges to remove "every

11

minority juror that's been on the panel so far." Defense counsel then stated: "Granted that I don't have African[-]Americans or Hispanics, but I pretty much have one of everything. They have pretty much all been removed by [*sic*] the panel. My client is not a minority himself. The first p[ere]mptory was of Middle Eastern descent. The one African[-]American was removed. The one Hispanic was removed. Right now everybody that's basically left is Caucasian."

The prosecutor, Claudine Ruiz, responded that she was a female Hispanic and that she did not recall anyone's racial makeup except for the African-American juror, prospective juror 11. The prosecutor stated, "I did not note any other juror as being Hispanic."

Defense counsel replied that prospective juror 8 was Hispanic. The court stated, "My notes reflect that as I couldn't tell," and the prosecutor said, "I have no idea." The court then indicated it would look at the prospective jurors' names, stating that "that's a risky venture to begin with." The prosecutor agreed, stating, "Especially since we didn't use the names at all, and I didn't look at the names."

After noting that "[d]etermining ethnic origin by itself is frequently fraught with mistakes," the court reviewed the prosecutor's use of peremptory challenges in the order those seven challenges were made. The court stated that, based on the name "Sahba," prospective juror 9 "may well be . . . of Middle Eastern origin"; but then stated, "I'm not sure that's a minority." The court found prospective juror 15 was a Caucasian male, and prospective juror 11 was an African-American male. Next the court found prospective juror 7 was a Caucasian female; prospective juror 22 "appeared . . . to be a Caucasian

12

female"; prospective juror 26 "appeared . . . to be a Hispanic male," whose last name "Rivera" "appear[ed] to be consistent with a Hispanic male"; and prospective juror 8 "appeared" to be a Caucasian or Hispanic male whose "last name of Caravantes would appear to be of Hispanic origin." The court noted that Alphonso appeared to be Caucasian and his last name "would be consistent with that."[7] The court asked the prosecutor whether she had anything to add to her previous comments, and the prosecutor replied, "I guess, at this point, I'll wait."

    1. *Ruling*

The court overruled the defense's *Batson/Wheeler* objection, finding there had not been a "pattern of systematic exclusion of any minority." The court observed that "other than the third peremptory challenge to [prospective juror] number 11, who we all agree is African[-]American, all the rest are to some extent risky in terms of characterizing their ethnic origin." The court noted that there was a pair of jurors with Hispanic surnames that "appear[ed] to be consistent with [their] visual appearance," but then stated, "[A]t this point, the court doesn't believe there's been a prima facie case made for the systematic exclusion of individuals of any particular origin or group."

    B. *Applicable Legal Principles* (*Batson/Wheeler*)

"Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity." (*People v.*

---

[7]    The probation officer's report states Alphonso is "White."

*Davis* (2009) 46 Cal.4th 539, 582 (*Davis*), citing *Batson*, *supra*, 476 U.S. at p. 97 & *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)

A rebuttable presumption exists that a prosecutor has exercised his or her peremptory challenges in a constitutional manner, and the burden is on the objecting defendant to demonstrate impermissible discrimination.  (*People v. Dement* (2011) 53 Cal.4th 1, 19; *People v. Cleveland* (2004) 32 Cal.4th 704, 732 (*Cleveland*).)

The California Supreme Court has explained that when the defense raises a timely *Batson/Wheeler* challenge to the prosecutor's use of peremptory challenges, a three-stage procedure applies:  " '*First*, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an *inference of discriminatory purpose*." [Citation.]  *Second*, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  *Third*, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' "  (*People v. Riccardi* (2012) 54 Cal.4th 758, 786, quoting *Johnson v. California* (2005) 545 U.S. 162, 168, italics added.)

Regarding the first stage of *Batson/Wheeler* error analysis, the high court has clarified that, "[t]o make a prima facie showing of group bias, 'the defendant must show that under the totality of the circumstances it is *reasonable to infer discriminatory intent*.' "  (*Davis*, *supra*, 46 Cal.4th at p. 582, italics added.)

14

If the defendant meets his or her burden of making a prima facie showing of group bias under this "reasonable inference" standard, "[t]he proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given [by the prosecution] for the peremptory challenge, *not* on the objective *reasonableness* of those reasons. [Citation.] So, for example, if a prosecutor believes a prospective juror with long, unkempt hair, a mustache, and a beard would not make a good juror in the case, a peremptory challenge to the prospective juror, sincerely exercised on that basis, will constitute an entirely valid and *nondiscriminatory* reason for exercising the challenge." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*Ibid*.)

The prosecutor's explanation need not rise to a level that justifies the exercise of a challenge for cause. (*People v. Williams* (1997) 16 Cal.4th 635, 664.) "[A]dequate justification by the prosecutor may be no more than a 'hunch' about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias and not simply as 'a mask for race prejudice.' " (*Ibid*.)

1. *Standard of review*

When a trial court denies a *Batson/Wheeler* objection based on its finding that no prima facie case of group bias was established, the reviewing court considers the record of the voir dire and affirms the ruling if it is supported by substantial evidence. (*People*

*v. Jenkins* (2000) 22 Cal.4th 900, 993.)  The reviewing court "accord[s] particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand."  (*Id.* at pp. 993-994.)

C.  *Analysis*

Having reviewed the record of the voir dire, we conclude substantial evidence supports the court's ruling that the defense failed to meet its threshold burden under *Batson/Wheeler* of making a prima facie case of impermissible group bias discrimination.

We begin our analysis by noting that Alphonso faults the court for overruling his objection to the prosecution's use of peremptory challenges to exclude four "minority jurors" (prospective jurors 9, 11, 27 & 8),[8] thereby suggesting that "minority jurors" is a cognizable group for purposes of *Batson/Wheeler* error analysis.  The California Supreme Court has held that " 'people of color' " is not a cognizable group for purposes of *Batson/Wheeler*.  (*Davis*, *supra*, 46 Cal.4th at p. 583.)  By parity of reasoning, "minority jurors" also is not a cognizable group for purposes of *Batson/Wheeler* analysis.

Jurors with Hispanic surnames, however, are a cognizable group for *Batson/Wheeler* purposes "even when 'no one knows at the time of challenge whether a particular individual who has a Spanish surname is Hispanic.' "  (*Davis*, *supra*, 46 Cal.4th at p. 584.)

---

8      As noted, *ante*, the record shows that when defense counsel made his *Batson/Wheeler* objection, the prosecutor had also used peremptory challenges to exclude three Caucasian prospective jurors (prospective jurors 15, 7 & 22).

16

Here, the prosecutor (Ruiz) stated during the sidebar conference that she did not look at the jurors' surnames. The prosecutor also said she was Hispanic, and she did not "recall anyone's racial make[]up" with the exception of prospective juror 11, whom she identified as "the African[-]American." The prosecutor added that she "did not note any other juror as being Hispanic." When defense counsel replied that Prospective Juror 8 was Hispanic, the prosecutor stated, "I had no idea."

The court appeared to share the prosecutor's views, stating that—apart from the prospective juror who they all agreed was African-American—"all the rest are to some extent risky in terms of characterizing their ethnic origin." The court indicated it thought prospective juror 26 could be Hispanic based on his surname; and stated that prospective juror 8 "may be a Hispanic male" although the court's notes "reflect[ed] the person appeared to be Caucasian or Hispanic."

Significantly, the record shows that defense counsel only identified Prospective Juror 8 as a Hispanic; he did not identify prospective juror 26 as a Hispanic.

The California Supreme Court has explained that although the exclusion of a single prospective juror may be the product of an improper group bias, " '[a]s a practical matter . . . the challenge of one or two jurors can *rarely* suggest a *pattern* of impermissible exclusion.' " (*People v. Bell* (2007) 40 Cal.4th 582, 598, first italics added.)

Given the foregoing record of the sidebar *Batson/Wheeler* proceeding and the presumption that the prosecutor exercised her peremptory challenges in a constitutional

17

manner (*Cleveland*, *supra*, 32 Cal.4th at p. 732), we conclude the court did not err in finding Alphonso failed to make the requisite prima facie showing that it is reasonable to infer that the prosecutor acted with discriminatory intent or purpose in using her peremptory challenges to excuse prospective jurors 9, 11, 26, and 8. (See *Davis*, *supra*, 46 Cal.4th at p. 582.)

In support of his claim that he did make the requisite prima facie showing, and relying on *Bell*, *supra*, 40 Cal.4th 582, Alphonso faults the court for failing to consider (1) whether the challenged jurors only shared the characteristic of membership in a protected group, and (2) whether the prosecutor failed to engage the subject jurors in more than "desultory voir dire" or to ask them any questions at all. Alphonso's reliance on *Bell* is unavailing.

In *Bell*, the California Supreme Court identified three nonexclusive[9] types of relevant evidence (which Alphonso refers to as "*Bell* factors") that a defendant may use to establish a prima facie case for purposes of *Batson/Wheeler* error analysis: (1) evidence that the prosecutor "has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group"; (2) evidence that "the jurors in question share only this one characteristic— their membership in the group—and that in all other respects they are as heterogeneous as

_____

[9] The nonexclusivity of the three types of relevant evidence mentioned in *Bell* is shown by the high court's statement that,"[t]hough proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned 'certain types of evidence that will be relevant for this purpose.' " (*Bell*, *supra*, 40 Cal.4th at p. 597, quoting *Wheeler*, *supra*, 22 Cal.3d at p. 280.)

the community as a whole"; and (3) evidence that "his opponent [failed] to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all." (*Bell*, *supra*, 40 Cal.4th at p. 597.)

Alphonso complains that "[n]o analysis of the *Bell* factors was undertaken" and the court erroneously failed to consider any of the three types of evidence (discussed, *ante*) identified in *Bell*. However, *Bell* does not *require* a trial court to consider the three types of evidence in determining whether a defendant has satisfied his or her burden of establishing a prima facie case. The language in *Bell* is permissive and only pertains to the types of evidence on which a *defendant* "may" properly rely as proof of a prima facie case for purposes of *Batson/Wheeler* error analysis.[10] (*Bell*, *supra*, 40 Cal.4th at p. 597.)

Here, the record shows that during the sidebar conference, Alphonso's counsel only relied on the first type of relevant evidence identified in *Bell*—evidence that the prosecutor "ha[d] struck most or all of the members of the identified group from the venire, or ha[d] used a disproportionate number of his peremptories against the group" (*Bell*, *supra*, 40 Cal.4th at p. 597)—by arguing that the prosecutor had used peremptory challenges to remove "every minority juror that's been on the panel so far." Defense counsel did not rely on the second and third types of evidence identified in *Bell*. That the court considered defense counsel's argument is implicitly shown by the fact that the court

---

[10] Alphonso's reference to the types of relevant evidence identified in *Bell*—upon which a *defendant* may properly rely as proof of a prima facie case of *Batson/Wheeler* error—as "*Bell* factors" inappropriately suggests they are factors a trial court must consider when conducting a *Batson/Wheeler* error analysis, such that failure to consider them constitutes error.

proceeded to review all seven of the prosecutor's peremptory challenges. We conclude the court did not err by failing to sua sponte consider the second and third types of evidence identified in *Bell*.

In support of his claim that the court incorrectly concluded he had failed to make a prima facie case, Alphonso discusses the voir dire responses of the excluded jurors, and concludes that the only thing that set those jurors apart from the other jurors then on the panel was their membership in a protected class. To the extent Alphonso is asking this court to engage in a comparative analysis of the challenged jurors and those who were then on the panel and ultimately served, we decline to do so because the court properly determined that Alphonso failed to make a prima facie case of purposeful discrimination. In *People v. Bonilla* (2007) 41 Ca1.4th 313—a "first-stage" *Wheeler/Batson* case in which the trial court overruled the defendant's *Wheeler/Batson* objections after concluding he had failed to make out a prima facie case that the prosecutor was engaged in impermissible discrimination—the California Supreme Court upheld the trial court's ruling and stated, "Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use [in a first-stage case] where the analysis does not hinge on the prosecution's actual proffered rationales, and we thus decline to engage in a comparative analysis." (*Bonilla*, at pp. 341, 350.) Here, the case before us is also a "first-stage" *Wheeler/Batson* case and, as in *Bonilla*, comparative juror analysis "has little or no use" because "the analysis does not hinge on the prosecution's actual proffered rationales." (*Id*. at p. 350.)

20

Alphonso also complains that the prosecutor did not ask any questions of the challenged jurors. However, that the prosecutor did not ask the challenged jurors questions individually is of little importance because, as the Attorney General correctly points out, the record shows the prosecutor was able to obtain information about the jurors and observe their demeanor when the court and defense counsel questioned them. (See *People v. Dement*, *supra*, 53 Cal.4th at p. 21.)

We conclude the court properly determined that Alphonso failed to make a prima facie case of *Wheeler/Batson* error; that is, a showing that under the totality of the circumstances it is reasonable to infer that the prosecutor acted with discriminatory intent when she used her peremptory challenges to excuse prospective jurors 9, 11, 26, and 8. (See *Davis*, *supra*, 46 Cal.4th at p. 582.)

## II. *DENIAL OF NEW TRIAL MOTION*

Alphonso next contends the court prejudicially abused its discretion and violated his constitutional right to present a defense by denying his motion for a new trial based on newly discovered evidence. We reject this contention.

### A. *Background*

#### 1. *Alphonso's motion in limine*

Alphonso moved in limine to be allowed to call Michelle's then-husband (husband) to testify that she had previously made false accusations that her husband abused her. At the hearing on the motion, defense counsel indicated Michelle and her husband were still married, but they were separated and dissolution proceedings had been ongoing for several years, and the husband would testify that he was in the United States

21

Navy and that Michelle had falsely accused him—both to Navy authorities and in the dissolution proceedings—of domestic violence against her and sexual abuse of their child.

The prosecutor acknowledged evidence of false allegations "can be admissible," but argued Michelle denied the allegations were false and opposed the admission of her husband's testimony because it was more prejudicial than probative and it was "going to be time-consuming." The prosecutor told the court there was a finding by the Navy Advocacy Program that the husband "was, in fact, an abuser in one particular incident"; the prosecutor had just received "the majority of documents relating to this," and she did not foresee this would be an issue in this case. She had also recently requested the family advocacy file under the Freedom of Information Act, but she was not certain she would receive the information before the trial began. Noting that Michelle and her husband had been married for 27 years, the prosecutor stated, "In reading through the divorce affidavits from both parties, there is a lot of meat on this bone."

Defense counsel stated he intended to limit the scope of husband's testimony to "the fact [Michelle] falsely accused him," and he would not seek to introduce evidence about "who's a good parent and who's a bad parent" or whether the children did not like to spend time with the victim. The court observed it was "in a bit of a vacuum," recognized the potential relevance of evidence that "any victim made what turned out to be false accusation of domestic violence," and deferred ruling until the husband could be examined at a separate hearing.

## 2. *Evidence Code section 402 hearing and the court's ruling*

After the prosecution rested its case, and outside the presence of the jurors, defense counsel reiterated that in 2007 Michelle falsely accused her husband of physically and emotionally abusing her and sexually molesting their daughter. Defense counsel acknowledged that if the husband were to testify the allegations were false, the prosecutor would call Michelle to testify to the contrary.

When the court stated that "we have some proceedings that occurred with the United States Navy that at least at some point led to counseling of the [husband]," defense counsel replied, "Yes." The court indicated it was inclined to exclude the husband's testimony, stating it was "left with . . . a 'he said she said' " and there was "some type of concession by the [husband] that something was going on, at least inferentially, by his accepting the [Navy's] counseling program."

The court then heard the testimony of the husband out of the presence of the jurors at a hearing conducted under Evidence Code section 402. The husband, a retired Navy Commander, testified he married Michelle in 1991 and they separated in 2007. They started divorce proceedings in 2009, but the divorce was still not final. They were the parents of a 17-year-old son and a 15-year-old daughter.

In 2007 Michelle accused her husband of mental, sexual, financial, and physical abuse, and the allegations were handled through the Navy arbitration system. The husband learned during the dissolution proceedings that Michelle had reported to Child Protective Services that he had sexually molested their daughter, but the matter had been dismissed as unsubstantiated.

23

The husband testified Michelle falsely alleged he mentally abused her when they got into arguments regarding the handling and care of their children. Her sexual abuse claim was based on her belief they should not have sex when she was on medication. She had been on various medications since 2000. Michelle alleged he had sex with her without her consent when she was medicated. The husband denied he ever did so. He said he initially refused her requests for sex when she first started taking the medications. After she "got normalized" with the medications, he acquiesced and had sexual relations with her.

He also testified Michelle's financial abuse claim stemmed from his decision to take over the family's bills after she failed to pay them on time and bounced checks. He indicated he thought Michelle's physical abuse claim was probably related to her sexual abuse claim and stated that "when the sexual one didn't pan out . . . she claimed again later for physical abuse." The husband also testified about an incident in which Michelle took the laptop he needed for work out of his car, they had a tug of war with the computer, and, when she tired he took both her hands off the computer, put it in the car, shut the door and left. He denied physically abusing her.

The husband testified that after the third or fourth "episode of an allegation," he asked the Navy mediators how he could bring it to an end. He was fearful it would hurt his career and wanted to stop it before he was up for promotion to captain. The mediators advised him he could take a 16-week course called the Cypress Men's Group. The husband asked what he needed to do to get in the course, and the mediators told him that if they found substantiation for a claim, they would recommend him for the group. He

24

then substantiated the mental abuse claim by stating he probably did get angry and was loud and that was probably stressful for Michelle. The husband thought she made another allegation of mental abuse after he completed the program. Michelle never told the police that he forced her to have sex or was violent with her.

The husband acknowledged the Naval Advocacy Committee substantiated the mental abuse claim in August 2007. He also testified that if Michelle said he kissed his daughter on the back of her head when she was sleeping and patted her butt when she was sleeping and awake, this would be true but he did not consider it to be sexual abuse. He acknowledged that the Naval Family Advocacy committee contacted him because of his alleged emotional abuse and controlling behavior and that the majority of the interactions between Michelle and the committee revolved around these subjects.

a. *Ruling*

After the husband testified, the court excluded his testimony. The court stated that although the husband was "a highly credible witness," his testimony "doesn't frankly establish false allegations of any substance at all." The court added that it did not believe the husband's testimony "would provide the jury with any relevant facts at this point," and found his testimony had "no probative value."

3. *Alphonso's motion for a new trial, the FAP records, and the court's ruling*

After the jury returned its guilty verdicts, Alphonso moved for a new trial based on newly discovered evidence, namely, records obtained through discovery from the Navy's Family Advocacy Program Case Review Committee's investigation (the FAP records) that the prosecutor had requested at the start of the trial, which the prosecutor

received and provided to the defense after the jury returned its verdicts. In his motion, Alphonso asserted the FAP records were relevant to the issue of whether Michelle previously had made false accusation of physical abuse because they showed that she had alleged her husband punched her, threw her against a wall, and pushed and shoved her; that she reported she did not have a car because she believed her husband would cut the brake lines if she had one; that she accused her husband of sexual abuse; and that she claimed he abused her an average of three times a month. Alphonso pointed out that the husband, during his testimony at the Evidence Code section 402 hearing, testified he never physically or sexually abused Michelle, but the court denied the defense request that the husband be allowed to testify about these allegations.

In her opposition to the new trial motion, the prosecutor argued the new evidence was cumulative to the evidence produced in discovery and presented at trial. Specifically, the prosecutor argued the family court records provided to defense counsel before trial included a November 2009 declaration in which Michelle claimed her husband had been violent with her in the past, the Navy found him guilty of domestic violence, she stopped driving shortly after she got married because of her husband's negative comments about her driving, she never drove again because of her husband's comments about damage he had done to other people's cars when he became upset with them, and her husband had a way of threatening her without actually doing so.

The prosecutor also represented that in an April 2010 declaration Michelle stated concern about her husband "inappropriately" kissing their daughter on the neck while the daughter slept and tapping her daughter's buttocks when she walked near him. In

addition, the prosecutor argued the husband's declarations described three domestic violence allegations Michelle made to the Navy, only one of which was substantiated; and in interviews with the defense the husband stated that Michelle had called Naval Family Advocacy five or six times to complain he was being mentally abusive to her.

In her opposition, the prosecutor also asserted that the "voluminous" FAP records produced by the Navy covered the same information contained in the family court records, the husband's statement, and his testimony. The prosecutor summarized the two referrals to the Family Advocacy Program and stated that the FAP records indicated that—in the first case, which was substantiated for emotional abuse—Michelle claimed her husband would come into her room after she had taken her sleeping pills and have sex with her without her consent; and, regarding physical abuse, she stated her husband had hit her one time many years earlier.

In the second case, which was not substantiated, Michelle spoke to a caseworker who referred the case for investigation of ongoing emotional abuse and control. Michelle told the caseworker that she lived in a separate home from her husband and that she feared her home might be bugged because her husband repeated things that she had said when he was not there. She said her husband controlled the finances at both homes and used the children to monitor her activities. During the risk assessment with a clinical provider, Michelle was asked for a history of abuse, and she responded that her husband had "punched her, thrown her into walls, grabbed and pushed her and would then act as if it were an accident (for example accidentally hitting her in the face with his elbow) or completely deny that anything had happened." Michelle said the physical abuse occurred

27

about three times a month and stopped when they separated 18 months earlier. She also mentioned she feared that if she owned a car, her husband would do something to it, like cutting the break lines. She said her husband had made statements in the past about what he had done to other cars belonging to people with whom he was angry, like "they'll never drive that car again[.]"

The prosecutor also argued Alphonso 's new trial motion should be denied because (among other things) impeachment evidence does not provide a basis for a new trial.

a. *Ruling*

At the hearing on the new trial motion during the sentencing proceeding, the parties agreed to submit four pages of the voluminous FAP records to the court under seal. After listening to the parties' arguments, the court ruled that defense counsel had exercised due diligence, but "to a large extent" the material was cumulative to what was previously available to both counsel, and the resolution of what happened between Michelle and her husband starting years earlier was just not "that probative to the issues" in the case. The court stated it was "confident there [was] no reasonable probability that had this information been available and even had it been presented to the jury that it would have resulted in a different result." Accordingly, the trial court denied the new trial motion.

B. *Applicable Legal Principles*

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has

28

been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' "  (*People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

Although granting or denying a motion for new trial on the ground of newly discovered evidence is a matter that lies within the sound discretion of the trial court, in ruling on such a motion the court considers whether (1) the evidence, and not merely its materiality, is newly discovered; (2) the evidence is not merely cumulative; (3) the evidence would render a different result probable on retrial of the cause; (4) the moving party could not with reasonable diligence have discovered and produced it at trial; and (5) the facts have been shown by the best evidence of which the case admits.  (*Delgado*, *supra*, 5 Cal.4th at p. 328; accord, *People v. Howard* (2010) 51 Cal.4th 15, 42-43.)

C.  *Analysis*

Here, we cannot say the court abused its broad discretion by denying a new trial. Assuming for purposes of discussion that the other factors discussed in *Delgado*, *supra*, 5 Cal.4th at page 328 are satisfied, Alphonso has not shown, and cannot demonstrate, a reasonable probability the newly discovered evidence would result in a different result on retrial.

"[W]hen a defendant makes a motion for a new trial based on newly discovered evidence, he has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented."  (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)

29

Here, Alphonso asserts in a conclusory fashion, without addressing the strong evidence of his guilt presented at trial, that "[i]t is highly likely—certainly more than probable—that at least one juror would have been [*sic*] entertained a reasonable doubt that [Michelle's] reports of [Alphonso's] alleged attacks were believable, after hearing the testimony of a 'highly credible' (the trial court's words) former Navy officer about her prior false claims." We disagree. Michelle's trial testimony regarding Alphonso's conduct was corroborated not only by the testimony of Michelle's therapist Sandra Gorchow and Officer Sdringola, but by the photographs that another officer took of the injuries Michelle suffered when Alphonso burned her with a cigarette.

Specifically, Gorchow testified that after Michelle, who was scared, started telling her in the car about what had happened, Michelle showed her both the bruises she had covered with makeup and the cigarette burns on her ankle and foot, and she also had Gorchow feel the "raised bumps" on her scalp. Gorchow testified she called 911 after Michelle got out of the car and went into the bathroom at a store.

Officer Sdringola, who responded to that call, also corroborated Michelle's testimony by testifying that Michelle told him about what had happened during the two incidents. Officer Sdringola testified he saw eight small, round, apparent burn marks on Michelle's foot and also saw raised bumps and bruising on her head. He stated that another officer photographed the injuries.

30

Due to the strength of the victim's testimony, as corrobated by the testimony of Gorchow and Officer Sdringola and the photographic evidence of her injuries, we conclude Alphonso has failed to meet his burden of showing it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented. Accordingly, we reject Alphonso's claims that the court abused its discretion and violated his constitutional right to present a defense by denying his motion for a new trial.

### III. *SECTION 654 (COUNTS 1, 2, 4, 6, 7 & 9)*

Last, Alphonso contends the concurrent terms of 25 years to life plus three years the court imposed for each of his convictions of counts 1 (inflicting corporal injury on a cohabitant), 2 (false imprisonment by violence), 4 (assault by means of force likely to cause great bodily injury (i.e., by suffocation)), 6 (inflicting corporal injury on a cohabitant), 7 (false imprisonment by violence) and 9 (making a criminal threat) should have been stayed under section 654. We agree.

A. *Background*

As previously noted, Alphonso committed the nine offenses of which he was convicted in this case during two incidents. He committed counts 1 through 5 during the first incident on July 19, which Michelle testified lasted about nine hours, and he committed counts 6 through 8 during the second incident on July 21 or 22, which lasted about six hours. According to the information, the commission of count 9 (making a criminal threat) spanned both incidents.

31

At the sentencing hearing, the court stated, "I do not believe Penal Code section 654 bars punishment for any of [the nine counts], but my sentence is not going to include additional consecutive time for each of the crimes."  The court explained that it "d[id] not believe sentence on any count is barred by Penal Code section 654 inasmuch as each act represented a separate violation—or separate act committed against the victim in this case."

The court sentenced Alphonso to 25 years to life in prison for his count 8 rape conviction plus three years for his prison priors, and a consecutive term of 25 years to life for his count 3 assault with a deadly weapon conviction plus three years for his prison priors.  For each of the remaining counts—counts 1, 2, 4, 5, 6, 7 & 9—the court imposed a *concurrent* sentence of 25 years to life plus three years.   Thus, the court imposed a total prison term of 50 years to life plus six years.

B.  *Applicable Legal Principles*

Section 654, subdivision (a) provides in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591), and ensures the defendant's punishment will be commensurate with his or her criminal culpability (*People v. Kramer* (2002) 29 Cal.4th 720, 723).  If a defendant suffers two convictions and punishment for one is barred by section 654, that section requires the sentence for

32

one conviction be imposed and the other be *imposed and then stayed*. (*People v. Deloza*, at pp. 591-592.)

Generally, whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses. (*People v. Hicks* (1993) 6 Cal.4th 784, 789.) If all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed. (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1780-1781.)

The question of whether a defendant harbored multiple criminal objectives is a question of fact for the trial court to decide. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) A trial court's determination that a defendant held multiple criminal objectives will be upheld on appeal if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

C. *Analysis*

As a preliminary matter, we note that Alphonso does not challenge under section 654 the punishments the court imposed for (1) his count 3 conviction of assault with a deadly weapon (a knife) and force likely to cause great bodily injury, which he committed during the first incident; (2) his count 8 conviction of rape, which he committed during the second incident; or (3) his count 5 conviction of attempting to dissuade a witness (Michelle) from reporting a crime, which spanned both dates.

We conclude that (1) with respect to the first incident, section 654 bars execution of the concurrent prison terms the court imposed for Alphonso's convictions of counts 1

33

(inflicting corporal injury on a cohabitant), 2 (false imprisonment by violence), and 4 (assault by means of force likely to cause great bodily injury (i.e., by suffocation)); (2) with respect to the second incident, section 654 bars execution of the concurrent prison terms imposed for Alphonso's convictions of counts 6 (inflicting corporal injury on a cohabitant) and 7 (false imprisonment by violence); and (3) section 654 also bars execution of the concurrent prison term imposed for count 9 (making a criminal threat), which spanned both incidents.

We reach these conclusions because the record shows the criminal acts Alphonso committed during each incident were part of an indivisible course of conduct; during each incident—as the prosecutor argued to the the jury—he acted with the same objective of asserting control and "ownership" of Michelle; and sufficient time elapsed between the two incidents to afford him an opportunity to reflect on his criminal conduct before renewing his criminal intent. Regarding Alphonso's intent and objective during those incidents, the prosecutor argued as follows during her closing arguments:

> "And that ultimate betrayal that the person who loves you isn't supposed to hurt you, isn't supposed to hurt you in this way, any way they can to make sure that they *control* you, that you stay in the relationship, that you continue to provide all of the things [Alphonso] had become accustomed to: Not just [Michelle's] companionship, but her home, her money, her body, her actions. Everything about [Michelle] was his. He *took ownership of he*r. He put his name on her leg. He branded her with cigarettes—cigarette burns. Not only was he *controlling her* and make sure she would not go against him, never tell, never put him in jail, but he was telling everyone who would see her that *she belonged to him* and no one else. [¶] *These are the counts in this particular case; there's nine of them*." (Italics added.)

34

Our conclusion that the record shows Alphonso's criminal acts during the first (July 19) incident constituted one indivisible course of conduct with a single objective finds support in the prosecutor's statement to the jury that:

> "We know this was at the end of a long period of time when [Michelle] had been forced to remain in a room, berated, yelled at, accused almost in interrogation style where [Alphonso] is accusing her of infidelity, trying to force her to admit being unfaithful to him; yelling at her; calling her all kinds of names; spitting on her— spitting in her face; slapping her; hitting her 20 to 30 times on the head with a hand, with a remote, banging her head in the wall."

The prosecutor's rebuttal closing arguments that "it's almost impossible to give a blow-by-blow over a nine-hour period" and that "much of the behavior was repetitive" also demonstrate the continuous, indivisible nature of Alphonso's conduct on July 19.

The following closing argument by the prosecutor supports our conclusion that the record shows Alphonso's criminal acts during the second incident (July 21 or 22) also constitute one indivisible course of conduct, but temporally separated from the first incident in such a way as to afford Alphonso an opportunity to reflect on his behavior and renew his intent:[11] "[T]he second day she was held for six hours against her will, told not to move, not to look him in the eye the whole time, not to leave . . . ."

---

[11]   " 'Under section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]" [Citations.] This is particularly so *where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one*, thereby aggravating the violation of public security or policy already undertaken.' " (*People v. Andra* (2007) 156 Cal.App.4th 638, 640, quoting *People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

35

The separate punishment imposed for Alphonso's count 9 conviction of making criminal threats during both incidents is also barred under section 654 because the record shows that in committing those criminal acts Alphonso acted with the same intent and objective. Michelle testified that, during the first incident, Alphonso threatened to kill her when she was on the bed. She also testified that, during the second incident, Alphonso threatened to kill her "many times" that day. By instilling fear in Michelle through the use of these threats, Alphonso acted in furtherance of his objective to control her.

In sum, with respect to the first incident, the judgment must be modified to stay under section 654 the execution of the concurrent sentences the court imposed for Alphonso's convictions of counts 1, 2, and 4. That section does not bar execution of the sentences imposed for his convictions of counts 3 and 5. As to the second incident, the judgment must be modified to stay under section 654 the execution of the concurrent sentences imposed for his convictions of counts 6 and 7. Execution of the sentence imposed for his conviction of count 8 is proper. In addition, the judgment also must be modified to stay under section 654 the execution of the concurrent sentence imposed for Alphonso's conviction of count 9. In all other respects, the judgment is affirmed.

36

## DISPOSITION

The judgment is modified to stay under Penal Code section 654 the execution of the concurrent sentences of 25 years to life plus three years the court imposed for each of Alphonso's convictions of counts 1, 2, 4, 6, 7, and 9.  As so modified, the judgment is affirmed.  The trial court is directed to amend the abstract of judgment to reflect this modification of the judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

NARES, Acting P. J.

WE CONCUR:

HALLER, J.

AARON, J.

37