Filed 12/14/15  P. v. Wadkins CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C077408 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F05944) |
| v. | |
| JAMES EUGENE WADKINS, | |
| Defendant and Appellant. | |

A jury found defendant and inmate James Eugene Wadkins guilty of possession of a "billy" while confined (Pen. Code, § 4502)[1] and battery by a prisoner on a non-confined person (§ 4501.5).  Defendant admitted a prior prison term allegation.  (§ 667.5, subd. (b).)  The trial court sentenced him to five years in prison.  On appeal, defendant contends the trial court erred under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d

---

[1] Further undesignated statutory references are to the Penal Code.

1

69] and *People v. Wheeler* (1978) 22 Cal.3d 258 by finding no purposeful discrimination based on the prosecutor's use of a peremptory challenge to remove the only African-American prospective juror in the first 18 jurors. Disagreeing, we affirm.

**BACKGROUND**

*The Crimes*

Defendant is serving a life term at Folsom State Prison. On June 9, 2013, defendant expressed to prison staff that he did not want any other prisoners placed in his cell with him. None were placed with him.

However, the next day, the guards saw defendant in his cell pacing, holding a weapon. The weapon was a piece of wood 22 inches in length, with a motor from a personal fan with the blades removed attached by torn bed sheets. There was a shoestring laynard to hold the weapon, which was a bludgeoning tool or club.

Defendant refused to submit to handcuffing, saying, "[Y]ou're gonna have to come get me. I'm going to hurt one of you." The officers received permission to attempt a cell extraction; defendant was uncooperative and refused to follow orders to come out of his cell voluntarily. Sergeant Kevin Renkert pepper sprayed defendant in his facial area. The spray appeared to have no effect; defendant washed off his face with liquid from a bucket under his bed. Defendant continued to refuse to comply with orders and Renkert sprayed him again. Renkert asked defendant what he was going to do with his weapon and defendant said he was not going to use it. Renkert told defendant to give him the weapon and defendant tossed it in the corner, where Renkert retrieved it.

Twice more defendant refused Renkert's orders to submit and was sprayed with pepper spray. Defendant then picked up the bucket of liquid and threw it at Renkert. The liquid covered the entire front of Renkert's body. Renkert then sprayed defendant in the chest area. Defendant dropped to the floor and crawled to the door. He stood up and Renkert cuffed him.

2

*Jury Selection*

Each prospective juror completed a standard court-issued, one-page questionnaire, asking about qualifications and general biographical information such as marital status, education, occupation, children, military service, prior jury service, and contact with the criminal justice system. In addition, the parties agreed to a longer juror questionnaire. This questionnaire asked potential jurors to note any question to which the answer was "yes," stating the judge would discuss those questions. There were 14 general questions about knowledge of participants in the trial, the trial itself, previous juror experience, strong feelings about the criminal justice system, and membership in any organization that takes positions on the criminal justice system. The next section asked about each juror's background, including experience or employment with law enforcement, police, or the courts; use of Internet social networks, physical handicaps that would make it difficult to serve as a juror, and any difficulty in listening and assessing testimony of a peace officer. The questionnaire listed 11 instructions the juror must follow and asked about disagreement or difficulty with these instructions. It asked about assessing the testimony of a correctional officer, knowledge of pepper spray, and experience of the juror or a close friend or family member with crime or force or violence. Finally, the questionnaire asked for any other reason the potential juror could not serve as a juror.

When the court questioned prospective juror M.Z., she said she had not answered "yes" to any question on the juror questionnaire. She had not served on a jury before, but had "c[o]me this far." She was retired and had been an eligibility specialist for the County on the Medi-Cal program. No close friends or relatives had been victims of crimes of violence and there was nothing about the charges that would make it difficult to serve as a juror. Neither attorney questioned M.Z.

The prosecution used four peremptory challenges; the first two on white females, the third on a white male, and fourth on M.Z., the only African-American of the first 18 jurors questioned. The defense used no peremptory challenges. The defense made a

*Batson/Wheeler* motion based on the challenge to M.Z. Counsel explained his client was white and he was making the challenge because M.Z. was the only black potential juror in the first 18 jurors (he did not make a record as to how many African-American jurors were on the entire panel called to the courtroom). He claimed M.Z.'s questionnaire gave no basis for removing her, also noting that neither side had questioned her.

The court noted that both defendant and Renkert were white and asked if race was an "issue" in the case. Counsel said no. The court described M.Z.'s questionnaire as "very sparse" and questioned how her race alone raised an inference of a discriminatory purpose. Counsel argued M.Z.'s questions were similar to other jurors who were accepted. "I'm left with the conclusion that she was challenged because she is, in fact, black and she's the only black juror up there."

The court found there was no prima facie case to establish an inference of discriminatory purpose in excusing M.Z. The court then invited the prosecutor to augment the record with any comments.

The prosecutor stated that since M.Z. had no answers to any of the more than 40 questions on the questionnaire, she felt M.Z. "was either being very uncooperative or not entirely forthcoming." Also, when the prosecutor was questioning the jurors about news reports, M.Z. gave her "very negative looks" and the prosecutor "perceived" "some sort of negative attitudes towards me." The defense attorney stated he saw no negative looks.

The next day, the prosecutor added to her comments. She found it surprising that M.Z. had no answers to the questions on the questionnaire, because M.Z. was retired and appeared to be in her 60's. The prosecutor suggested the lack of answers indicated M.Z. "was not being forthcoming or uncooperative or maybe too shy to share those details." The "blank questionnaire" had made an impression on the prosecutor.

## DISCUSSION

"Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias. [Citations.] The now familiar

4

*Batson*/*Wheeler* inquiry consists of three distinct steps.  First, the opponent of the strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges.  Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications.  Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination.  [Citation.]" (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).)

"Although the question at the first stage concerning the existence of a prima facie case depends on consideration of the entire record of voir dire as of the time the motion was made [citation], we have observed that certain types of evidence may prove particularly relevant.  [Citation.]  Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong.  [Citation.]  A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias.  [Citations.]" (*Scott, supra,* 61 Cal.4th at p. 384.)

When a trial court denies a *Batson*/*Wheeler* objection based on its finding that no prima facie case of group bias was established, the reviewing court examines the record of the voir dire and affirms the ruling if it is supported by substantial evidence. (*People v. Jenkins* (2000) 22 Cal.4th 900, 993.)  The reviewing court "accord[s] particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand." (*Id.* at pp. 993-994.)  Where, as here, the trial court has

5

determined that no prima facie case of discrimination exists, then allows or invites the prosecutor to state reasons for excusing the juror but refrains from ruling on the validity of those reasons, our review is limited to the first-stage ruling. (*Scott, supra*, 61 Cal.4th at p. 386.)

Here, defendant's *Batson/Wheeler* claim "was particularly weak as it consisted of little more than an assertion that a . . . prospective juror[] from a cognizable group had been excused. Such a bare claim falls far short of 'rais[ing] a reasonable inference that the opposing party has challenged the jurors because of their race or other group association.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 442.) The prosecution used four peremptory challenges and defendant challenged only the last one: the exclusion of the only African-American in the first 18 prospective jurors. The record does not indicate whether there were additional African-Americans in the remaining jury pool. "[T]he small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible. '[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.' [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 598.)

Other than the fact that M.Z. was African-American, defendant's motion was supported only by his counsel's opinion that M.Z.'s questionnaire showed nothing to indicate she would not be a good juror for the prosecution and that neither side had questioned her.[2] The failure to voir dire the challenged juror may reflect a discriminatory animus. (*People v. Wheeler, supra*, 22 Cal.3d at p. 281.) On the other hand, as the court

---

[2] On appeal, defendant also relies on a comparative analysis of M.Z.'s responses to those of selected jurors. As defendant recognizes, our Supreme Court has rejected using a comparative juror analysis in the first stage of the *Wheeler/Batson* analysis. (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.)

6

observed, defendant is not African-American, a fact that weakened any inference of discrimination.  (See *ibid*.)  Indeed, the trial court found, and the defense agreed, that both the defendant and the alleged victim were white *and* that race was not an issue in the case.  In any event, the trial court took these considerations into account in finding that no prima facie showing was made.  "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]"  (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)  Giving proper deference to the trial court, we affirm the court's ruling that defendant failed to make a prima facie showing of group bias.

## DISPOSITION

The judgment is affirmed.


_____/s/_____
Duarte, J.



We concur:



_____/s/_____
Hull, Acting P. J.



_____/s/_____
Hoch, J.

7